Stanley **BARRETT** and **W. R. Grace &
Company, Inc.,** Appellants,

v.

**Lawrence STEPHANY,** Appellee.

Court of Appeals of Kentucky.

May 17, 1974.

William O. Bertelsman, Bertelsman & Bertelsman, Newport, for appellants.

Richard S. Nelson and Philip Taliaferro, Davies, Nelson & Taliaferro, Covington, for appellee.

PALMORE, Justice.

On December 23, 1966, an automobile owned and driven by the appellee, Lawrence Stephany, collided with the trailer portion of a truck-trailer unit (hereinafter called the truck) owned by the appellant W. R. Grace & Company and operated by its employe, the appellant Stanley Barrett. Stephany's suit against the owner and operator of the truck culminated in a verdict and judgment for the plaintiff in the amount of $22,554, from which the defendants appeal. The judgment is affirmed.

The accident happened at the intersection of Licking Pike and North Street in Campbell County, Kentucky. Licking Pike is a 4-lane highway running north and south, with two lanes for traffic moving in each direction and the center marked by a yellow line. North Street is a 2-way street extending westwardly from a T-intersection with the west line of Licking Pike. It has one lane for traffic moving in each direction. A small cafe called Gloria's Inn is located on the east side of Licking Pike opposite the mouth of North Street. The intersection is about .2 of a mile south of a small hill or rise on Licking Pike, from which point it comes into the view of southbound travelers on the 4-lane highway.

Both vehicles were moving southward on Licking Pike. According to Stephany and a passenger riding in his car, when they came over the rise they saw the truck about midway between them and the intersection, in the left-hand southbound lane

and with its left-turn blinker light operating; Stephany was driving in the right-hand or curb lane at 40 to 45 m.p.h.; when they got within 150 to 200 feet of the truck it suddenly made a right turn across their projected line of travel and into North Street; Stephany at once applied his brakes and skidded into the right side of the trailer at about its center. The automobile (a convertible) went completely under the trailer, but miraculously neither of its occupants was killed or more seriously injured than hereinafter mentioned with respect to Stephany. Stephany's automobile left 102 feet of skid-marks to the point of impact.

Stephany intended to pass the truck on the right. He did not sound his horn. He says the truck was never in the right-hand lane until it turned at the intersection.

Although Barrett, the truck driver, did not testify, he had made a statement to a state trooper immediately after the accident, and except for an excluded portion which will be later discussed in this opinion an affidavit incorporating this statement was admitted into evidence pursuant to CR 43.03. Barrett's version of the incident was that the truck was entirely in the right-hand lane with its right-turn blinker light operating for a distance of about 600 feet as it approached the intersection, and that he had to pull only "slightly" to the left in order to negotiate the turn into North Street. He insisted that at no time did he "give up possession of the right hand lane" and "at the most I took up only 10% of the left hand lane." He said that before executing the turn he checked both mirrors for traffic to the rear and that "there was nothing behind me at that time. I had the tractor off of Licking Pike and all of the way into North Street and a small portion of the trailer was also in North Lane [sic]. Then out of the corner of my eye I saw a black car out of the corner of my eye. About the same time I heard his brakes squeal . . . I was hauling a 40 foot trailer and as a result my speed could not have been over 5 miles per hour."

There was other testimony by an experienced truckdriver to the effect that a rig such as the one being driven by Barrett could not be turned to the right from Licking Pike into North Street except from the center or left-hand lane.

The most critical question raised on the appeal relates to the instruction on contributory negligence, in which the jury was told among other things that it was Stephany's duty "to sound his horn before passing said truck, if you believe same was necessary." The appellants contend that the horn duty was absolute, and should not have been qualified by the words, "if you believe same was necessary."

KRS 189.080, the horn statute, requires a motorist to sound his horn "whenever necessary" as a warning to pedestrians and other drivers. Subsection (1) of KRS 189.340, the passing statute, provides that the operator of an overtaking vehicle shall sound his horn "before passing" and shall pass to the left of the overtaken vehicle. Subsection (2) of the same statute permits passing to the left or right of the overtaken vehicle on a 4-lane highway "when the movement can be made in safety," but says nothing with respect to sounding the horn.

We held in Deason v. Odem, Ky., 453 S.W.2d 598, 599 (1970), and in Fuson v. VanBebber, Ky., 454 S.W.2d 111, 113 (1970), that the absolute horn duty imposed by KRS 189.340(1) applies to the passing permitted by KRS 189.340(2). Upon further reflection we have come to the conclusion that this cannot be.

■ As indicated in the *Deason* opinion, ours is the duty to construe the statutes literally if it is reasonably possible to do so. However, it is at once apparent that upon turning the page to KRS 189.350(1) and giving it too a literal construction we would fall into an impossible anomaly.

The latter statute provides categorically and without exception that when the driver of the vehicle being overtaken hears the horn of the vehicle that is about to pass he shall "give way to the right." Literally, therefore, if the motorist who intends to pass on the right as permitted by KRS 189.340(2) must sound his horn, and if the driver of the vehicle being overtaken obeys KRS 189.350(1) and gives way to the right, it is not possible for the pass to be made on the right and the provision for such a movement in KRS 189.340(2) can have no effect.

■ As they appear today, obviously KRS 189.340(2) is of more recent vintage [1] than KRS 189.340(1) and KRS 189.350(1). They cannot all be construed literally across the board and make sense. They ought to be amended and brought up to date. Meanwhile, insofar as they require giving way to the right and passing to the left, KRS 189.340(1) and KRS 189.350(1) simply cannot apply to passing on the right as permitted by KRS 189.340(2). To the extent that they hold the horn duty absolute on a 4-lane highway we overrule *Deason* and *Fuson*. We hold that the only horn duty applicable to passing under KRS 189.340(2) is the general duty under KRS 189.080 to sound a warning whenever under the attending circumstances it is required by the exercise of ordinary care.[2]

■ It follows that the instruction given by the trial court on this phase of the case was not improper. Whether the exercise of ordinary prudence under the circumstances required Stephany to give warning of his approach was fairly a question for the jury to decide.

■ The court also gave a last clear chance instruction, and we readily agree that this was an error. Stephany was not in peril until the truck had moved into his traffic lane, and there is no basis whatever for a conclusion that Barrett thereafter could have moved the truck out of that traffic lane in time to avoid the collision. Cf. Rankin v. Green, Ky., 346 S.W.2d 477 (1960). Nevertheless, we are of the further opinion that the error was harmless. The jury returned its verdict on a prepared form which called for it to specify the number of the instruction on which the verdict was based. Instruction No. 1 set forth Stephany's duties and was the principal contributory negligence instruction. No. 2 stated in substance that if Barrett had given an appropriate signal and started his turn it was Stephany's duty not to pass on the right while the turn was being made. No. 3 set forth Barrett's duties and was the negligence instruction. No. 4 reiterated the contributory negligence principle with a last clear chance qualification. Nos. 5 and 6 related to damages. Nos. 7 and 8 covered definitions and the number of jurors required for a verdict. The verdict was as follows:

"We, the Jury, find for the Plaintiff, Lawrence Stephany, under Instruction No. 3, and award a total sum of $22,554.00.

/s/ Edward S. Pendery, Foreman"

■ Unless the record demonstrates that the verdict was not influenced by an improper instruction, for purposes of review it must be presumed that it was. Prichard v. Kitchen, Ky., 242 S.W.2d 988, 992 (1951); Lawhorn v. Holloway, Ky., 346 S.W.2d 302, 303 (1961); Kentucky Stone

1. c. 106, Acts of 1938. The other two statutes date back at least to 1920.

2. Though it is customary to instruct in the words of the statute, "if necessary" can only mean what would *appear* necessary to a person in the exercise of ordinary care. It would be better practice to state this duty as follows: "To sound his horn as a warning to the driver of the vehicle about to be passed if you believe from the evidence that such precaution was required by the exercise of ordinary care."

Co. v. Gaddie, Ky., 396 S.W.2d 337, 340 (1965). In this case, however, we think the verdict clearly discloses on its face that Instruction No. 4 played no part in it.

■ KRS 189.350(2) provides that in all cases of meeting, passing, or overtaking, the occupants of each vehicle shall give the occupants of the other such assistance "as the circumstances reasonably demand in order to obtain clearance and avoid accidents." Instruction No. 3, enumerating Barrett's duties, included the following: "(f) To exercise care for the passing vehicle and to assist it in getting by without mishap." No objection is made to this form, but the appellants insist that the trial court erred in not including the reciprocal duty in the instruction listing Stephany's duties. The answer, we think, is that all of Stephany's duties for which there was evidentiary support were stated and there was nothing in the evidence to suggest anything more he might or could have done in the way of "assisting" the driver of the truck. This simply was not the type of accident KRS 189.350(2) was designed to prevent.

Earlier in this opinion we referred to an excluded portion of Barrett's statement, which was:

"It is my opinion, based on my experience as a truck driver for many years, that the driver of the Mustang was speeding, since he came upon me so suddenly."

■ Citing authorities including Wilburn v. Simons, 302 Ky. 752, 196 S.W.2d 356, 358 (1946); Louisville Taxicab and Transfer Co. v. Crane, Ky., 262 S.W.2d 188, 189 (1953), and Eubank's Adm'x v. Austin, Ky., 288 S.W.2d 358, 360 (1956), appellants contend that the statement was admissible and that its exclusion was a prejudicial error. It is significant, however, that in each of those cases the evidence had been admitted by the trial court and was then held competent by this court. In none of them was the court called upon

to say whether an exclusion of the testimony would have been prejudicial. Conceding for the sake of the argument that the statement was admissible, we take the view that its probative value was virtually nil. The latitude that is allowed a witness in estimating speed from a momentary glimpse probably owes its existence to the fact that such an opinion cannot do much to help or hurt anyway. We think the same inference drawn by Barrett from the circumstances, if valid, would have been drawn by the jurors also. We find no prejudicial error in this respect.

Prior to the trial the defendants took the deposition of Dr. Leonard Stark, an orthopedic surgeon. It contained the following questions and answers:

Q- "Would you say, then, Doctor, that you would have an opinion stated to a reasonable medical certainty, based on observation of this lack of symptoms and based on your study of the Xrays and your experience that you can rule out a herniated disc in this individual?"

Mr. Taliaferro: "Objection. I think it is leading."

A- "In my medical opinion, this man does not have anything to indicate the presence of a herniated disc."

Q- "Let me rephrase the question, just in case it was leading. State whether or not in your opinion this individual has a herniated disc."

Mr. Taliaferro: "Objection."

A- "This man does not have a herniated disc, in my opinion."

■ When this deposition was read at the trial, the court overruled the objection to the first question, but for some unaccountable reason counsel for the defendants did not go on and read the answer. Then, for an equally obscure reason, the trial court *sustained* the objection to the second question, so the jury did not get that answer either. Now, having cut his

own throat by not reading the answer to the first question, counsel for the appellants asked this court to reverse the judgment because he was not permitted to read the same answer to the second question. We agree that it was an error to sustain the objection, but the remainder of Dr. Stark's testimony which was read to the jury made it abundantly explicit that in his opinion Stephany did not have any significant injuries or disability. We quote, for example, the very next questions and answers as follows:

Q- "Did you find any objective symptoms that would indicate any disability in this individual that would interfere with his work?"

A- "The only finding that I had in this examination was in the neck region. There was a slight restriction of rotary motion toward the right side estimated at about 10 per cent less than the normal range expected. Rotation to the left side and the flexion and extension and lateral bending movements of the neck were all normal. Other than that, the only other finding was a subjective one of some slight tenderness at the fifth lumbar vertebra in the midline. The reflexes were also tested in this individual, and they were found to be normal. So from my examination there were minimal findings and nothing that would keep a man from active work."

Q- "In your opinion, did you find anything that would indicate that this individual would need future medical attention?"

A- "No."

And further (under cross-examination):

Q- "Doctor, Dr. Menke says that Larry Stephany will have permanent injuries from this accident. Would you be in substantial agreement at least to the permanent injuries to some degree?"

A- "I don't know what you are referring to here, whether it is the neck or the hand or the back or just what you have in mind."

Q- "Doctor, any of the three, to some degree, will any of the three have permanent injuries, if you are able to make this opinion one way or the other, based upon reasonable medical certainty or probability?"

A- "Well, on the basis of my examination at this time, the only real finding was the slight scarring of his fingers and the very slight restriction of motion in his neck. So with reference to these points, there is some residual at this time."

It is quite beyond cavil that by enumerating certain minor conditions as the only things he *did* find from his examination of Stephany Dr. Stark necessarily eliminated everything else, including any indication of a herniated disc. We do not think the jury could have failed to comprehend the import of his testimony, so again it is our opinion that the error was not prejudicial.

The last argument is that the award was excessive. The amount of the verdict reflected $4604 in special damages and $17,950 for pain and suffering and impairment of earning power. We are asked to grade the probative values of the expert testimony given by the various medical witnesses. That we cannot do. It belongs to the jury. According to Dr. Curwood Hunter, a neurological surgeon and member of the faculty at the University of Cincinnati, as a result of the accident Stephany positively has a herniated intervertebral disc at L4–5 or a "large one" at L5–S1, or both, and there is a "strong possibility" of another in the cervical area of the spine; he is in need of a laminectomy; and unless he undergoes successful surgery of that nature he will have a persisting disability of 25% to 40% to the body as a whole. This doctor made a magnificent witness, and we cannot fault the jury for accepting his opinions at face value. If they are correct, and we have to leave that to the jury, the award was not excessive.

The judgment is affirmed.

All concur.