Argued and submitted September 25, reversed and remanded November 25, 1987, reconsideration denied January 15, petition for review allowed February 9, 1988
(305 Or 102)

# KRAUSE,
*Appellant,*

*v.*

# AMERICAN AEROLIGHTS, INC., et al,
*Respondents.*

## (A8312-07630; CA A38663)

745 P2d 796

Jas J. Adams, Portland, argued the cause for appellant. With him on the briefs were Acker, Underwood & Smith, Portland.

Lloyd B. Ericsson, Portland, argued the cause for respondents. With him on the brief was Martin, Bischoff, Templeton, Biggs & Ericsson, Portland.

Before Richardson, Presiding Judge, and Newman and Deits, Judges.

RICHARDSON, P. J.

## RICHARDSON, P. J.

Plaintiff appeals from a judgment for defendant in this strict products liability action, arising out of injuries plaintiff sustained when an "ultralight" aircraft manufactured by defendant American Aerolights and sold by defendant Sky-Ryders crashed while plaintiff was piloting it. Plaintiff contended that the crash was caused by a tear in the fabric on the rear edge of one of the wings and that the plane was dangerously defective because of the "propensity of the wings to tear." The jury found, in a special verdict, that the plane was not "defective and unreasonably dangerous in any of the ways alleged by plaintiff."

During the course of the trial, plaintiff offered seven exhibits, including six safety bulletins and a repair kit which the manufacturer had distributed after plaintiff had been injured and other problems had occurred. They were offered as probative of the wing tearing problem and of the manufacturer's efforts to remedy it. The trial court ruled that "post accident corrective measures are not going to be received in evidence." The dispositive question on appeal is whether those rulings were erroneous. More specifically, the question is whether the rule excluding evidence of subsequent remedial measures in cases of negligence and other "culpable conduct," now codified as OEC 407, should be extended to strict products liability actions. It is a question of first impression in this state.[1]

OEC 407 provides, in relevant part:

> "When, after an event, measures are taken which, if taken previously, would have made the event less likely to occur, evidence of the subsequent measures is not admissible to prove negligence or culpable conduct in connection with the event."

The commentary to the section states, *inter alia:*

> "The Legislative Assembly takes no position whether

---

[1] The Supreme Court and we, respectively, found it unnecessary to decide the question in *Phipps v. Air King Manufacturing,* 263 Or 141, 143, n 1, 501 P2d 790 (1972), and *Hackett v. Alco Standard Corp.,* 71 Or App 24, 691 P2d 142 (1984), *rev den* 298 Or 822 (1985).

We have considered and do not agree with the parties' alternative arguments that the appeal can be decided on other grounds.

> ORE 407 applies to exclude evidence of subsequent remedial measures in an action based on strict liability in tort. It leaves the resolution of this issue to decisional law."

*See* Kirkpatrick, *Oregon Evidence* 120 (1982).

Although the parties couch some of their arguments in terms of whether OEC 407 should be construed to apply to products liability cases, we think that, given the legislature's express disclaimer of intent, the more accurate characterization of the issue is whether the common law rule which was codified in OEC 407, *see Van Gordon v. PGE Co.,* 298 Or 497, 502, 693 P2d 1285 (1985), should be judicially extended. The characterization makes *little* difference, because, as the court noted in *Van Gordon,* the code provision and its rationales "merely [restate] decisional law in Oregon." 298 Or at 502. However, under our understanding of the issue, certain arguments that the parties make, *e.g.,* those which turn on language in OEC 407 which is not founded in the common law rule, are not relevant.

The parties direct our attention to myriad cases from other jurisdictions. It suffices to say that there is a split of authority on the question before us and that there is no decisive weight of authority. Many of the cases on which the parties rely have been decided on the basis of materially identical analogs of OEC 407 in the Federal Rules of Evidence and other states' evidence codes. To the extent that those decisions turn on the language of codified rules, they are not particularly helpful, because the Oregon legislature has made it clear that no answer to the question is implied by its use of the same or similar language. To the extent that the decisions have turned on legal and policy considerations, the parties have ably culled the persuasive points from them and incorporated those into their own arguments. We have given due consideration to the opinions of courts of other jurisdictions, and we conclude that no purpose would be served by an exhaustive discussion of those opinions. We will refer to or discuss cases from other jurisdictions only in contexts where they have particular relevance.

Two rationales have been offered for the exclusion of evidence of subsequent remedial measures. The first is that the evidence can be perceived by a factfinder as an admission of antecedent fault, but "is not in fact an admission or in any

event * * * has low probative value on a relevancy scale." *Van Gordon v. PGE Co., supra,* 298 Or at 503. The second rationale "is that of public policy, encouraging safety measures to be undertaken after accidents." *Van Gordon v. PGE Co., supra,* 298 Or at 503.

The essence of defendants' arguments is that those rationales have the same force in products liability cases as in cases involving negligence or culpable conduct. The essence of plaintiff's arguments is that there are distinctions between the two kinds of cases which make the application of the exclusionary rule in the strict products liability context inappropriate. Plaintiff contends that evidence of remedial measures can be highly probative of a product defect, in contrast to the attenuated or non-existent relevance of such evidence to negligence or other culpability. Plaintiff also argues that, as a matter of policy and reality, manufacturers should and do have other incentives to remedy defective products and that, therefore, the evidentiary rule is neither needed nor socially desirable as a device for encouraging them to cure defects. Plaintiff explains:

> "The focus in a strict products liability action is upon the characteristics of the product, not the conduct of the manufacturer.
>
> "The public policy basis of encouraging subsequent remedial measures is weaker in the strict products liability context. In a negligence case, that policy outweighs the probative value of the evidence, because subsequent conduct has little relevance to the breach of the duty of due care as of the time of the accident. In a strict products liability action, however, the evidence has a very high probative value concerning the product's defectiveness. The stronger policy consideration inherent in the theory of strict products liability is that one who markets a defective product should be responsible for injuries caused by that product. The incentive for manufacturers to take remedial measures at the earliest opportunity is entirely consistent with a rule admitting evidence of such subsequent measures in cases arising before the measures are taken. The earlier the precautions are taken, the less the risk to the manufacturer."

Although there is considerable logic to plaintiff's argument, there are also logical problems with it. It is true that evidence of subsequent remedial measures can sometimes be

probative of a product defect and that the offered evidence in this case was. It is also true that subsequent repair evidence has little or no tendency to show that a defendant in a negligence case failed to exercise due care before the injurious event occurred. However, the vice that the judicial opinions have identified in the use of subsequent repair evidence is as much present in the strict liability context as in the negligence context: in both, the evidence tends to bolster the proof of the ultimate fact—the *existence* of a product defect or of negligence at the time of injury—through the marginally related fact that the defendant became *aware* at some time of the defect or the injurious condition.

Nevertheless, as plaintiff contends, the difference between the use of the evidence in the two contexts is that, in products liability cases, subsequent remedial measures can be directly probative of the defect but, in negligence and other fault cases, they can seldom be probative of the nature of the defendant's conduct before the accident.

To illustrate, if a customer slips on debris in a store, the shopkeeper may or may not have been negligent in connection with the customer's fall. The fact that he removed the debris *after* the incident can show only that he had become aware of its presence by *that* time, and it is irrelevant to whether he was or should have been aware of it *before* the injury. Conversely, in products liability cases, whether the defendant was at fault before or after the event is not material to liability. The critical question of fact is whether there was a defect in the defendant's product at the time when the plaintiff was injured. Although subsequent repair evidence has little or no propensity to show whether antecedent conduct was negligent or otherwise blameworthy, it can be probative of whether and when the condition at which the remedial efforts were aimed existed.

We agree with plaintiff that evidence of subsequent remedial measures can be significantly more relevant to proof of the ultimate fact in products liability cases than in cases where that fact is negligence or other species of fault. Moreover, because fault or the absence of fault is not material in strict liability cases, subsequent repair evidence is less likely to prejudice the defendant through an inference which the

factfinder might draw that the remedial measures constitute an admission.

The second facet of plaintiff's distinction is less convincing. He relies, *inter alia,* on *Ault v. Intenational Harvester Co.,* 13 Cal 3d 113, 117 Cal Rptr 812, 528 P2d 1148 (1974), where the court said:

> "[N]ot only is the policy of encouraging repairs and improvements of doubtful validity in an action for strict liability since it is in the economic self interest of a manufacturer to improve and repair defective products, but * * * the application of the rule would be contrary to the public policy of encouraging the distributor of mass-produced goods to market safer products." 13 Cal 3d at 120.

We are aware of nothing to substantiate plaintiff's and the California court's surmise that manufacturers have any more economic incentive than do negligent tortfeasors to correct harmful conditions. On the face of things, there is no obvious reason why a negligent tortfeasor of modest means would have less of a financial inducement to reduce the risk of further injury and litigation than a large manufacturer; if economic factors alone were considered, the potential for a greater number of injuries and lawsuits which the manufacturer might risk by leaving a defect unremedied would seemingly be offset by its superior ability to withstand the cost of litigation and liability. Moreover, it is also likely that remedying a defect in a widely distributed product would be substantially more costly than repairing the injurious condition in the average negligence case.

The public policy prong of the reasoning in *Ault* is more compelling than its economic prong, but only slightly so. Although defective "mass-produced goods" may be capable of causing more injuries than a dangerous instrumentality under the control of a negligent tortfeasor, and although public policy does favor the marketing of safe products, it can hardly be said that public policy favors the converse in negligence cases, *i.e.,* continuing neglect which is likely to result in some injuries, albeit fewer than a defective product might cause.

Perhaps the reason why we do not find it self-evident that the admissibility of subsequent repair evidence is more likely to discourage remedial efforts in one context than in the other is that we see nothing self-evident about the evidence

having that effect in either context. To our knowledge and, apparently, the parties', no court, legislature or other authority has ever documented that the evidence is likely to have such an effect; they have simply postulated that it will. *See D.L. v. Huebner,* 110 Wis 2d 581, 329 NW2d 890 (1983); *see also Van Gordon v. PGE Co.,* 64 Or App 135, 139, 667 P2d 532 (Richardson, P. J., dissenting), *remanded* 295 Or 811, 670 P2d 1026 (1983), *on remand* 67 Or App 290, 677 P2d 739 (1984), *rev'd* 298 Or 497, 693 P2d 1285 (1985).

There is, of course, no requirement that courts and legislatures support their policy decisions with evidence or documentation. Predictive and other intangible values can provide legitimate bases for their decisions. It is important to recognize, however, that the second rationale for the exclusionary rule *is* an expression of policy, while the first, in negligence and other "culpable conduct" cases, is that the excluded evidence is essentially irrelevant. The first rationale disappears in strict products liability cases, because subsequent remedial measures are directly probative of defectiveness. The question is whether the policy embodied in the second rationale is strong enough in itself to warrant the extension of the rule to products liability cases. We conclude that it is not.

Assuming that the admissibility of the fact that repairs were made has any tendency to deter the making of repairs, it is at least as apparent that other considerations, *e.g.,* the avoidance of injury and of further liability, will also enter into a negligent tortfeasor's *or* a manufacturer's decision whether to take corrective action. The marginal motivation to make repairs which the exclusionary rule might add may support the rule's application to evidence which is irrelevant or virtually so. However, that marginal impetus is not enough to justify the exclusion of evidence which, like the exhibits here, is relevant to the ultimate fact in the case. The trial court erred by excluding the evidence.

Reversed and remanded.