**FORD MOTOR COMPANY, Movant,**

v.

**William Franklin FULKERSON, Pauline Fulkerson, Allstate Insurance Company and Melinda Herrensmith, Individually, as Mother of Troy E. Cilone, Infant and as Administratrix of the Estate of Troy E. Cilone, Deceased, Respondents.**

No. 89–SC–797–DG.

Supreme Court of Kentucky.

April 11, 1991.

Rehearing Denied Aug. 29, 1991.

William D. Grubbs, Gregory A. Bolzle, Woodward, Hobson & Fulton (John M. Thomas, Office of the General Counsel, Ford Motor Co., Dearborn, Mich., of counsel), Louisville, for movant.

Kenneth L. Sales, Louisville, for respondents, Fulkersons.

William A. Miller, Sr., William A. Miller, Jr., Louisville, for respondent, Herrensmith.

John Crutchfield, Louisville, for respondent, Allstate Ins. Co.

LEIBSON, Justice.

This is a products liability case. The movant, Ford Motor Company, won at the trial level, but the Court of Appeals reversed and remanded on grounds: (1) the instructions were erroneous; and (2) trial error in excluding evidence of a change in the design of the product. Having granted discretionary review of the Court of Appeals' decision, we affirm in all respects but one, which we discuss towards the end of this Opinion.

The case arises out of a motor vehicle accident on June 2, 1985, on a two-lane road in southeast Jefferson County. Troy Cilone was driving his 1984 Ford Ranger pickup truck in a northerly direction when his vehicle crossed over the center line into the southbound lane and struck a vehicle approaching from the opposite direction operated by William F. Fulkerson. Cilone was killed and Fulkerson was seriously injured.

Troy Cilone's estate brought a products liability action against Ford Motor Company claiming a defect in the left front wheel assembly caused it to separate and Cilone to lose control and collide with Fulkerson. Fulkerson (and his wife who sued for loss of consortium) intervened, suing both Ford and Cilone's estate. Fulkerson stated alternative claims for relief, alleging the collision was caused either by the Ford truck's losing its wheel or Cilone's negligence.

At trial and on appeal both Cilone's estate and Fulkerson contend that the defective condition of the Ford vehicle was the cause of this accident. Their theory is that the wheel of Cilone's 1984 Ford Ranger separated from the truck at the left front spindle assembly. A passenger in Cilone's vehicle testified that he recalled a loud noise and a shout from Cilone immediately before he lost control. Substantial physical evidence included various gouge marks and a scrape mark on the roadway surface beginning some 100 feet before the point of impact, and several pieces of the left wheel assembly found south of the impact point, interpreted by plaintiffs' experts and an accident reconstructionist from the Coroner's office as proof that Cilone's left front wheel separated from his truck and then became lodged beneath it as both the truck and wheel slid across the center line towards the oncoming vehicle.

On the other hand, Ford's theory was that Cilone simply lost control of his vehicle and allowed it to veer into the opposite lane. Ford produced substantial expert testimony to support its view that the Ford truck functioned normally up until Cilone lost control, and that it was the impact which caused the wheel to separate from the truck.

Without regard to whether the left front wheel separated from the 1984 Ford pickup truck before or after the collision, it was uncontroverted that separation occurred at the left front spindle assembly because the spindle stem was still attached to the wheel and had pulled free from the spindle body.

Dr. Alan Johnson, a metallurgical engineer from the University of Louisville, who had examined the spindle parts for the Coroner's office, concluded, and so testified, that there was a metallurgical defect when it left the manufacturer. As stated above, the accident reconstructionist em-

ployed by the Coroner, testified the spindle stem was defective. In addition to the Coroner's experts and police, plaintiffs presented two more experts: one, a former Ford employee with experience in testing vehicles for major auto manufacturers, who matched damaged parts of the Ford truck to the scrapes and gouges on the road surface, testified the tire separated from the truck during normal use; and the second, John Stilson, a mechanical engineer who had been employed at Ford for ten years and worked directly with the Ford Ranger, testified to both a manufacturing defect and a design defect as the cause of this occurrence. The manufacturing defect was, supposedly, a poor fit between the spindle stem and the spindle body which allowed air and water to penetrate the joint and corrosion to occur, thus eventually loosening the spindle stem within the spindle body. The design defect was, supposedly, failure to employ a secondary retention device as a fail safe feature in the event the joint between the spindle stem and spindle body should loosen in use.

Ford's experts identified certain physical evidence from the vehicles and certain marks on the inner race of the spindle body, described as "Brinnell" marks, which in the opinion of these experts indicated the wheel separated from the truck on impact.

Ford used a "heat-shrink" method for retention or bonding the spindle stem onto the spindle body. The spindle body is heated so that its bore hole is expanded. At this point the spindle stem is inserted and the whole assembly is quenched in water so that the spindle body contracts around the spindle stem. This was the only retention feature used by Ford on its 1984 Ranger spindle stem assembly, although a number of different secondary retention features were available at the time. Ford made changes in the spindle stem in 1985 by putting a flare or flange on the inboard end of the stem, which serves to prevent the spindle stem from loosening and pulling out of the spindle body hole if the "heat-shrink" joint should fail. Ford, of course, contends this did not, and cannot, happen so that a secondary retention feature is unnecessary.

John Stilson, plaintiffs' expert, was permitted to testify as to different design features then available that could have been used to afford a secondary retention feature, but evidence of the design feature that was actually added to the spindle stem in 1985, thus preventing the spindle stem from pulling out even if the spindle stem joint loosened, was excluded. Ford's expert had testified on deposition the design change was made for reasons of cost and not safety.

First, we consider whether the instructions were prejudicially erroneous. Instruction No. 1 directed the jury to return a verdict for the intervening plaintiff, Fulkerson, against "either ... Ford Motor Company, or ... the Estate of Troy E. Cilone,...." The trial court then presented the products liability issue in Instructions Nos. 2 and 3. Instruction No. 4 stated the duties of Cilone in driving his vehicle. The remaining instructions covered damages, the definition of ordinary care, and the number of jurors required to reach a verdict.

The products liability instructions were as follows:

"INSTRUCTION NO. 2

It is the claim of all plaintiffs, William Franklin Fulkerson and Pauline Fulkerson (hereinafter referred to as Fulkersons) and Melinda Herrensmith, Administratrix and Mother of Troy E. Cilone (hereinafter referred to as Herrensmith), that the 1984 Ford Ranger operated by the deceased, Troy E. Cilone (Cilone), was in a defective condition. You will find for all plaintiffs as against the defendant, Ford Motor Company, under this Instruction if you are satisfied from the evidence as follows:

(a) That the left front spindle assembly of the 1984 Ford Ranger operated by Cilone was in a defective condition and unreasonably dangerous;

(b) That such defective condition existed at the time this 1984 Ford Ranger was sold by the defendant, Ford Motor Company;

AND

(c) That such defective condition was a substantial factor in causing injury to Fulkerson and death of Cilone.

Otherwise, you will proceed to Instruction No. 4.

INSTRUCTION NO. 3

'Defective condition' as used in these Instructions can result from either defects in 'design' or 'manufacture' of the spindle assembly about which you have heard evidence.

(a) Liability results from defective design if the jury is satisfied from the evidence the method that Ford Motor Company used to fabricate or test the left front spindle assembly created such a risk of accidental separation that an ordinarily prudent company engaged in the manufacture of such assemblies being fully aware of the risks, would not have put it on the market.

(b) Liability results from defective 'manufacture' if the jury is satisfied from the evidence that when the spindle assembly left the Ford Motor Company's control, it lacked any element necessary to make it safe for reasonable use, or contained any condition that made it unsafe for reasonable use.

Under these Instructions, the jury shall answer the following Interrogatories, using Verdict Form 'A' as follows:

*Interrogatory 1.*

Do you believe from the evidence that the left front wheel of the Cilone truck separated before its collision with the Fulkerson truck and as the result of a 'design' defect?

YES___ NO___

*Interrogatory 2.*

Do you believe from the evidence that the left front wheel of the Cilone truck separated before its collision with the Fulkerson truck and as the result of a 'manufacturing' defect?

YES___ NO___

If you have answered 'YES' to either of the above Interrogatories, you should proceed to Instruction No. 5. If you answered 'NO' to both Interrogatories, proceed to the next Instruction.

■ At the outset one might ask why it was necessary to do anything more to frame the factual issue than ask the jury to decide whether the wheel separated from Cilone's pickup truck before the impact and caused the collision, or whether it separated from the vehicle after the collision as a result of the impact. "Limiting an instruction to the salient facts in issue, on which the conclusion of liability or non-liability necessarily depends," is the appropriate method where the issues can be so resolved, *Phelps Roofing Company v. Johnson*, Ky., 368 S.W.2d 320, 323 (1963). *See also Barker v. Sanders*, Ky., 347 S.W.2d 529, 531 (1961), suggesting that in an intersection case instructions may and often should be simplified to submitting the case on the precise and certain issue of whether a party had the green light.

Unlike the many jurisdictions that use pattern instructions, and otherwise explain the law of the case to the jury, the practice in Kentucky abjures the abstract and requires the trial court, applying (rather than stating) the underlying legal principles, to frame the dispositive issue.

"Our approach to instructions is that they should provide only the bare bones, which can be fleshed out by counsel in their closing arguments if they so desire." *Cox v. Cooper*, Ky., 510 S.W.2d 530, 535 (1974).

■ But here we believe the trial court properly stated the products liability issue in *Instruction No. 2*. Since the time Kentucky adopted the doctrine of "strict liability" in products cases as stated in the *Restatement, Second, Torts*, § 402A, in the case of *Dealer's Transport Company v. Battery Distributing Company*, Ky., 402 S.W.2d 441 (1966), the Kentucky practice has been to state the liability issue in the terms of Restatement: Did the defendant manufacture, sell or distribute the product "in a defective condition unreasonably dangerous to the user ... ?[1] Under *Instruction No. 2* and without objection, the jury

---

**1.** There are certain caveats applying to this rule which are not in point in this case.

was instructed to decide whether liability attached using the standard stated in the *Restatement, Second, Torts, supra.* Further, in its Brief to our Court the appellant, Ford Motor Company, maintains that "[e]ven had Plaintiffs proven that the stem separated from the spindle before the accident ... they still had to show that such separation was attributable to something Ford did wrong, either in the design or manufacture of the spindle assembly."

There was evidence from both sides as to whether there was in fact a manufacturing defect revealed by metallurgical examination. There was also substantial evidence as to whether the design of the product was deficient. Ford's view of this case, as presented, was that there was no proof of a defective condition, either by reason of manufacture or design, even if separation occurred before impact. Thus, *Instruction No. 2* was an appropriate statement of the issue.

■ The problem is not *Instruction No. 2* but *Instruction No. 3.* In it the trial court expanded on the term "defective condition" by explaining such "can result from either defects in 'design' or 'manufacture' of the spindle assembly," and then in subparagraphs (a) and (b) it attempted to explain the meaning of defective design or defective manufacture, and erred in doing so. The explanation of defective manufacture is not at issue, but the explanation of defective design was fatally flawed. We agree with the Court of Appeals that "these instructions were unnecessarily specific and limiting," and that *Instruction No. 2* would have sufficed, but we would not reverse the case because of this if *Instruction No. 3* were not prejudicially erroneous because it is misleading and confusing in explaining liability for defective design.

*Instruction No. 3(a)* states the jury must be "satisfied from the evidence the method that Ford Motor Company used to fabricate or test the left front spindle assembly created such a risk of accidental separation that an ordinarily prudent company ... would not have put it on the market." The subject of this sentence is

"the method ... used to fabricate or test," but the subject should be the design of the product lacking a secondary retention feature. *Instruction No. 3(a)* attempts, but fails, to convey the meaning of design defect as explained in *Nichols v. Union Underwear Co., Inc.,* Ky., 602 S.W.2d 429 (1980). By expressing this concept in terms of the "method used to fabricate or test," rather than the design of the product, the trial court significantly impaired the meaning of this landmark case.

It cannot fairly be said the jury understood the court's meaning in asking about "the method ... used to fabricate or test." The design risk here, if there was one, was from failing to prevent the wheel from coming off if joint separation occurred. Under the evidence the jury could have believed that, although the "heat-shrink method" was an acceptable method to fabricate the joint between the spindle stem and spindle body, corrosion and loosening were inherent characteristics in such a joint, the effects of which would be avoided by designing in a secondary retention feature, but this was not the question presented.

This case illustrates why we caution against instructions getting into evidentiary matters, subquestions which better practice suggests should be omitted from the instructions and left to the lawyers to flesh out in closing arguments. The trial judge misstated the design defect issue in trying to spell it out. *Rogers v. Kasdan,* Ky., 612 S.W.2d 133, 136 (1981), presents an analogous situation. In a medical malpractice/hospital liability case, complicated like this products case, we reversed because the trial court's failure to adhere to the "bare bones" principle in giving instructions that "could have given the false impression that unless all these procedures were complied with exactly, the hospital breached its duty."

In *Montgomery Elevator Co. v. McCullough,* Ky., 676 S.W.2d 776, 780–81 (1984), we stated:

"Considerations such as feasibility of making a safer product, patency of the danger, warnings and instructions, sub-

sequent maintenance and repair, misuse, and the products' inherently unsafe characteristics, while they have a bearing on the question as to whether the product was manufactured 'in a defective condition unreasonably dangerous,' are all factors bearing on the principal question rather than separate legal questions."

A trial court is well advised to leave consideration of these evidentiary factors to the arguments of counsel rather than attempting to frame them up in the instructions on the ultimate questions. The language used may be confusing or misleading. It was here.

Further, Instructions Nos. 2 and 3, taken together, were confusing because the last sentence in *Instruction No. 2* directed the jury to "proceed to Instruction No. 4" if *not* "satisfied from the evidence" that the product was marketed "in a defective condition" and a "substantial factor" as set out in *Instruction No. 2*. Having been so instructed, we can only speculate as to whether, if, or how the jury then considered or applied *Instruction No. 3*, the court's instruction undertaking to define "defective condition" both as to "design" and "manufacture."

*Instruction No. 3* ends with two interrogatories for the jury to answer regarding the existence of the "design" or "manufacture," and then directs the jury if it answers "YES" to "either of the above Interrogatories, you should proceed to Instruction No. 5. If you answered "NO" to both Interrogatories, proceed to the next Instruction." Again, we can only speculate how the jury would proceed through the maze generated by these directions on where and how to "proceed" through the instructions.

The appellant, Ford, maintains that error in defining "defective design" in *Instruction No. 3* should be charged against Fulkerson, not Ford, because Fulkerson's tendered instructions included an "explanation of unreasonably dangerous." But the "explanation" tendered by Fulkerson accurately reflected the explanation provided in *Nichols v. Union Underwear Co., Inc.,* *supra,* whereas the explanation given by

the trial court did not. We note that *Nichols* was *reversed* because the court gave an inaccurate definition of when a product is "unreasonably dangerous."

■ Rather than speculating whether the jury understood the issues despite the instructions, we must presume that a verdict was influenced by an improper instruction. *Barrett v. Stephany,* Ky., 510 S.W.2d 524 (1974). The plaintiffs tendered an instruction properly stating the law, and this does not invite or excuse giving an incorrect instruction.

Next, we consider whether the trial court erred in excluding evidence of the design changes made in the 1985 Ford Ranger model, providing a secondary retention feature by flaring the stem end. The testimony established it was likely the design change was initiated before the accident in question. The testimony from Ford's expert was that the new manufacturing process used on the spindle stem was simply to reduce overall cost of production, and that the extra retention from flaring the stem end was only an incidental benefit. Ford's position is that evidence related to a secondary retention feature is irrelevant and immaterial because the primary bond was sufficient to withstand separation, so no secondary retention feature is necessary. Nevertheless, the testimony from plaintiffs' experts suggested that a design change of this, or similar, nature would produce a safer product because it would protect against failure problems inherent in a joint fastened only by the "heat-shrink" process. The question is what the jury could infer from the evidence as a whole, and the answer is that the jury could conclude on the one hand there was no manufacturing defect in the joint itself, but on the other hand the potential for separation inherent in a joint thus connected would make the spindle assembly, lacking a secondary retention feature, unreasonably unsafe.

Plaintiffs' experts were permitted to testify that designing in a secondary retention feature was feasible and necessary to make the product safer, but the more compelling evidence, which was excluded, was proof

such a design change was made in the 1985 model. The trial court explained its reasons as "public policy considerations" and "the fact that this evidence may be more prejudicial than it would be helpful to the plaintiff." [2] This reasoning is flawed, as we will explain.

The Court of Appeals reversed this ruling of the trial court without addressing the admissibility of this evidence, applying KRS 411.330, Section 5 from the Products Liability Act of 1978, which states, in pertinent part:

"In any product liability action, evidence of any ... change in ... design, ... after the date of manufacture, shall be admissible in evidence only after the same has been offered to the court in a hearing out of the presence of the jury and the court has ruled that the evidence is relevant and material."

The preamble to the "Products Liability Act of Kentucky" states it was enacted "to codify certain existing legal precedents and to establish certain guidelines which shall govern the rights of all participants in products liability litigation." 1978 Ky. Acts Ch. 91 (S.B. 119). At the time when the General Assembly enacted this legislation, there were a number of ongoing controversies, nationwide, over how to apply the newly emerging concept of strict liability to consumers for defective products. One of them was whether the judicial policy of long-standing which barred evidence of subsequent remedial repairs to prove antecedent negligence or culpable conduct should apply in products liability cases. Remedial measures taken after an event, which if they had been taken previously would have made the event less likely to occur, as a general rule (with many exceptions) are excluded in negligence cases, although probative of the issue, because the policy of the law is to encourage individuals to take measures that might prevent further injuries to other persons. *See, e.g., Cox v. City of Louisville,* Ky., 439 S.W.2d

51 (1969) and *Fisher v. Hardesty,* Ky., 252 S.W.2d 877 (1952).

With the advent of strict liability for defective products, the focus *shifts* from the "conduct of the actor" to the "condition of the product," *Montgomery Elevator Co. v. McCullough, supra,* 676 S.W.2d at 780. This raised a serious question whether the reasons underlying the rule excluding evidence of subsequent remedial repairs in negligence cases apply in products cases. A change in product design is not, strictly speaking, a "repair." The basic policy consideration in negligence cases for excluding evidence of subsequent repairs was because of an overriding interest in repair of the offending condition. This policy consideration has little or no application in dealing with a design change because:

1) The issue is not whether the seller has admitted misconduct—the seller is liable even though he has exercised all possible care, *Restatement, Second, Torts,* 402A(2)(a). Otherwise stated:

"Although subsequent repair evidence has little or no propensity to show whether antecedent conduct was negligent or otherwise blameworthy, it can be probative of whether and when the condition at which the remedial efforts were aimed existed." *Krause v. American Aerolights,* 88 Or.App. 383, 745 P.2d 796, 798 (1987).

2) Rarely, if ever, is there a direct connection between a design change to improve the product's safety and a particular, specific occurrence. This is especially so in a situation such as the present case where the design change was initiated, and probably implemented, before the accident in question occurred.

Whether and how to apply the rule excluding evidence of subsequent remedial repairs in products cases was an open question in 1978 when the General Assembly enacted the Products Liability Act. California had just decided a landmark case, *Ault v. International Harvester Co.,* 13 Cal.3d 113, 117 Cal.Rptr. 812, 528 P.2d 1148

2. The trial judge added "particularly since most of the evidence in your case appears to be in the area of manufacturing defect rather than as a

design defect." This afterthought refers to Ford's view of the case, not the plaintiffs.

(1975), which was the subject of an Annotation in 74 A.L.R. 3d 1001, and a number of law review articles. *Ault* rejected the policy underlying the rule in negligence cases barring proof of subsequent remedial repairs as inapplicable in products cases on grounds the products liability action seeks to prove a defect in the product rather than culpable conduct, and:

> "[I]t is manifestly unrealistic to suggest that such a producer will forego making improvements in its product, and risk innumerable additional lawsuits and the attendant adverse effects upon its public image, simply because evidence of adoption of such improvement may be admitted in an action founded on strict liability for recovery on an injury that preceded the improvement." 528 P.2d at 1152.

A 1977 treatise, R. Lempert and S. Saltzburg, *A Modern Approach to Evidence*, 187–89, states:

> "In terms of our analysis the basic justification for abandoning the remedial measures rule in products liability cases has to do with the way in which the evidence is relevant. In a products liability case the plaintiff must usually show that there was a defect in the way in which a product was designed or manufactured. Except where the defect is obvious (as when a Coke bottle explodes), the plaintiff must usually show that some alternative way of manufacture or design was both safer and feasible. A subsequent improvement is highly probative on both these points. While even a non-negligent defendant may correct an apparent defect after an accident, a business is not likely to change a product unless the change promotes safety and is feasible. Indeed the question of whether a product is defective is so likely to lead to defense arguments properly controvertible by evidence of subsequent remedial measures that it makes sense to drop the rule in these cases and admit the evidence as part of the plaintiff's affirmative case." [3]

Following *Ault*, numerous cases endorsed its principle. There are also a number of cases cited by appellant, Ford, refusing to endorse this principle, but almost without exception these cases were decided *after* 1978 and can hardly be accepted as having impacted the public policy the General Assembly sought to codify in the Products Liability Act.

The General Assembly's public policy statement in KRS 411.330 is that evidence of "alteration, modification, improvement, repair or change in or discontinuance of the manufacture, shall be admissible," but "only after ... the court in a hearing out of the presence of the jury ... has ruled the evidence is relevant and material." The Act both sets a policy of admissibility and offers procedural guidelines to protect the products liability defendant from having such evidence discussed in the presence of the jury unless and until the trial court has first decided relevancy. We need not decide whether, under the separation of powers doctrine, the General Assembly had the constitutional power to decide whether such evidence should be admissible, because we agree that, as a general principle, evidence of design changes should be admissible where relevant in products cases. The reasons behind excluding evidence of remedial repairs which apply to negligence cases do not carry over to products cases.

The design changes made in the 1985 Ford Ranger spindle stem directly concerned the ability of the spindle stem to stay secure within the spindle body hole. Cross-examination of Ford's experts on this point certainly would have been probative of the issue of whether the 1984 Ford Ranger spindle stem design was safe. While Ford did not undertake to confront plaintiffs' expert on the feasibility of additional retention features, proof that Ford actually *did* change its design in 1985 in a way to help keep spindle stems secure would be probative of the quality of the 1984 spindle design. Other evidence by

---

**3.** In the present case the defendants sought to mitigate against use of evidence to prove the change was "feasible" by not controverting feasibility when plaintiffs' experts testified about the potential for designing a secondary retention feature, but the question whether the product needed to be changed to make it safer was both controverted and relevant.

expert testimony to prove a design change was necessary and feasible to make the product safer was not as salient or probative as the change itself. It is the difference between the hypothetical and the concrete.

■ Next, we consider whether the trial judge's procedure in considering the evidence of a design change was sufficient to comply with the statutory threshold requirement of a preliminary hearing. We agree with the appellant the procedure was sufficient, but we agree with the Court of Appeals that the trial judge then erred in excluding this evidence, which he thought "technically may be admissible under some theory," on "public policy considerations [and] the fact that it may be more prejudicial than it would be helpful." The Court of Appeals stated in reversing this case that under KRS 411.330 the trial judge should have confined his decision solely to whether the evidence was relevant and material. We agree.

■ Further, notwithstanding the terms of the Products Liability Act, we agree with the trial judge that he retains power to consider whether evidence of little probative value "may be more prejudicial than it would be helpful." The Products Liability Act may state public policy but it cannot rewrite judicial procedure in determining relevancy. *Cf. Gaines v. Commonwealth*, Ky., 728 S.W.2d 525 (1987). But we disagree with the way both the trial court and the Court of Appeals utilized this principle. The trial court erred in *using* the principle to exclude evidence in circumstances where it did not apply. The Court of Appeals' Opinion erred in concluding the Products Liability Act *devitalized* the principle.

■ Lawson, *Kentucky Evidence Law Handbook*, § 2.00(B) (2d ed. 1984), explains the "standard of relevancy" as follows:

"An item of evidence—an evidentiary fact—is relevant when it renders a material ultimate fact more probable or less probable than it would be without the item."

The product change in this case fits within this explanation because the ultimate fact at issue was whether the product as designed was unreasonably unsafe. But part of this rule of relevancy is a corollary stated in *Empire Metal Corp. v. Wohlwender*, Ky., 445 S.W.2d 685, 688 (1969), as follows: where the evidentiary value is "remote" and "far outweighed by the certainty [of] prejudice" generated by the nature of the evidence, it should be excluded. In *O'Bryan v. Commonwealth*, Ky., 634 S.W.2d 153, 156 (1982), we state this rule in terms of whether "the resulting prejudice ... outweighs its probative value." And, in *Commonwealth v. Morrison*, Ky., 661 S.W.2d 471, 473 (1983), we summarize "when dealing with evidence of a litigant's prior misconduct, where such evidence is debatably or remotely relevant, the trial court must decide whether the *probative* value of the evidence outweighs its *inflammatory* nature." [Emphasis original].

In the present case there is nothing "inflammatory" in the "nature" of the design change. There is nothing inherent in the evidence that in the next year's model Ford flared the spindle stem to impugn Ford's integrity, suggest immorality, or otherwise unduly prejudice the jury against Ford. In *Dollar v. Long Mfg., N.C., Inc.*, 561 F.2d 613, 618 (5th Cir.1977), in ruling on evidence similar in nature, the court notes: "Virtually all evidence is prejudicial or it isn't material. The prejudice must be 'unfair.'" The trial court should not withhold evidence which is not inflammatory or otherwise unduly prejudicial simply because the trial judge is concerned the jury might overemphasize its importance. This corollary to the rule of relevancy is not a grant of discretion to the trial court to apply to a balancing test. Once relevancy is established the evidence is admissible, and it is then up to counsel in argument to give it proper perspective.

■ Here the trial court, at least in part, based its decision to exclude the evidence of a design change on a misunderstanding of when to apply the standard for excluding evidence because its probative value is slight and significantly outweighed by its potential for causing undue prejudice. The omitted evidence was important for the

plaintiffs on the design defect issue. If the design changes about which the plaintiffs' expert theorized were relevant—and they were—the design change that actually occurred was obviously more so. The Court of Appeals should have reversed with directions to admit this evidence, rather than directing the trial judge to again decide the relevancy issue.

We affirm the decision of the Court of Appeals to reverse and remand this case for further proceedings consistent with this Opinion.

STEPHENS, C.J., and COMBS, LAMBERT, LEIBSON and REYNOLDS, JJ., concur.

SPAIN, J., dissents by separate opinion in which WINTERSHEIMER, J., joins.

SPAIN, Justice, dissenting.

I respectfully dissent. The trial court's instructions to the jury properly separated the issues of design and manufacturing defect in determining whether the product was in a "defective condition unreasonably dangerous." The separate jury instructions simplified for the jury the types of product defects which could make the product unreasonably dangerous under the facts of this case. The second instruction properly required the jury to answer the pivotal question raised in all products liability cases; i.e., was the spindle assembly of the Ford Ranger truck in a "defective condition unreasonably dangerous" when it was placed in the stream of commerce? The third instruction was consistent with the second instruction because it defined for the trier of fact what could constitute a defective condition of the product under the evidence presented at trial and whether the defective condition resulted from defective design or defective manufacture or both. The jury was clearly directed to proceed to the fourth instruction if they did not find the existence of a "defective condition unreasonably dangerous."

We have recognized only two types of defects which will render a product in a "defective condition unreasonably dangerous." *Dealers Transport Co. v. Battery Distributing Co.*, Ky., 402 S.W.2d 441 (1966). A manufacturing defect exists in a product when it leaves the hands of the manufacturer in a defective condition because it was not manufactured or assembled in accordance with its specifications. *See Ford Motor Co. v. McCamish*, Ky. App., 559 S.W.2d 507 (1977). A design defect exists in a product when a manufacturer fails in his duty to exercise reasonable care to design a product that is reasonably safe for its intended and foreseeable use. *Jones v. Hutchinson Manufacturing Inc.*, Ky., 502 S.W.2d 66 (1973). These two types of product defects require separate standards of proof. A manufacturing defect requires the jury to determine whether the product failed because of an error in the process of manufacture or assembly. *Ford Motor, supra.* A design defect requires the jury to consider the "feasibility of making a safer product, patency of danger, warnings and instructions, subsequent maintenance and repair, misuse, and the products' inherently unsafe characteristics." *Montgomery Elevator Company v. McCullough*, Ky., 676 S.W.2d 776, 780 (1984). If either defect is proven, then the product is considered to be in a "defective condition unreasonably dangerous." *Nichols v. Union Underwear Co., Inc.*, Ky., 602 S.W.2d 429 (1980). If the product does not contain a manufacturing or design defect, then the product cannot be in a defective condition unreasonably dangerous. The bifurcation of these separate types of defects was merely a logical extension of the inartful standard which the majority apparently requires to be applied in all jury instructions in product liability cases.

It also should be noted that the instructions complained of by the plaintiffs below were the same, in essence, as the ones which they tendered at trial. I believe that this constitutes a waiver of any objection by these parties.

I do not believe that the trial court abused its discretion when it excluded evidence that Ford had subsequently changed its design of the spindle assembly of the Ford Ranger truck to include a backup or safety feature. The plain meaning of KRS

411.330 requires the trial court to admit evidence of any change of a product "... only after the same has been offered to the court in a hearing out of the presence of the jury and the court has ruled that the evidence is relevant and material." *Id.*

The record indicates that Judge Schroering complied with both the spirit and the letter of the law of the statute. The trial court held *two* hearings to determine the relevancy and materiality of the evidence of the subsequent design change. At both hearings, the plaintiffs failed to prove to the satisfaction of the trial court that the changes were remedial and not for the purpose of cost. The trial court properly overruled the admission of the evidence because it was not relevant or material. The majority's decision to substitute its judgment for the trial court virtually eliminates any discretion which a trial judge may have been granted under the statute in determining whether to admit evidence of a subsequent design change in product liability cases.

WINTERSHEIMER, J., joins in this dissent.