load limiters and belt loads in the 1992 Hyundai Excel. Ford had disclosed that its experts would rebut plaintiffs' proffered testimony, and Ford claimed that it was unaware prior to trial as to the nature of Syson's testimony.

The district court squarely rejected this argument, finding that plaintiffs had disclosed the nature of Syson's testimony prior to trial. In his report, Syson stated that "a force limiter in the torso belt" was an option available to Ford to improve its restraint system design. At his deposition, Syson stated that he would provide exemplars of load limiters during his testimony. A year prior to trial, plaintiffs informed Ford that one of those exemplars would be a load limiter used in the Hyundai Excel. Despite these disclosures, the district court found, Ford never divulged prior to trial that it would call any witnesses to testify about load limiters in the Hyundai Excel. Ford does not address the above facts in its brief before this court nor does it provide any explanation as to why its failure to disclose was justified. It has not demonstrated that the district court clearly erred.

Ford next argues that it would simply be unfair to exclude its proffered testimony. We conclude that this is not the case. Although it was attempting to present rebuttal testimony, Ford's unexcused failure to disclose that its experts would testify regarding Hyundai Excel load limiters did not allow plaintiffs the opportunity to prepare properly for these witnesses. Furthermore, the district court allowed one Ford witness, Michelle Vogler, to testify about the 1992 Hyundai Excel, stating in particular that the Escort and the Excel had the same "chest loads." The court thus did allow at least a limited response to Syson's "surprise" testimony. Again, Ford has not demonstrated that the district court clearly erred.

## VIII.

For the foregoing reasons, the judgment of the district court is **AFFIRMED**.

*RECOMMENDED FOR FULL-TEXT PUBLICATION*
Pursuant to Sixth Circuit Rule 206

ELECTRONIC CITATION: 2000 FED App. 0137P (6th Cir.)
File Name: 00a0137p.06

# UNITED STATES COURT OF APPEALS

## FOR THE SIXTH CIRCUIT

CHARLES KING, as Administrator of the Estate of Patti Ann King,
    *Plaintiff- Appellee,*

AMANDA SUE KING, by and through her next friend Charles King; ASSOCIATED INSURANCE COMPANIES,
    *Intervening Plaintiffs-Appellees,*

    *v.*

FORD MOTOR COMPANY; MAZDA MOTOR CORPORATION,
    *Defendants-Appellants.*

No. 98-5960

Appeal from the United States District Court for the Eastern District of Kentucky at London. No. 95-00117—Jennifer B. Coffman, District Judge.

Argued: August 6, 1999

Decided and Filed: April 19, 2000

Before:  BATCHELDER and COLE, Circuit Judges;
MARBLEY, District Judge.

————————————

**COUNSEL**

**ARGUED:**  E. Duncan Getchell, Jr., MCGUIRE, WOODS, BATTLE & BOOTHE, Richmond, Virginia, for Appellants. Samuel E. Davies, Barbourville, Kentucky, for Appellees. **ON BRIEF:**  E. Duncan Getchell, Jr., Rosewell Page, III, MCGUIRE, WOODS, BATTLE & BOOTHE, Richmond, Virginia, Bryan Todd Thompson, DINSMORE & SHOHL, London, Kentucky, for Appellants.  Samuel E. Davies, Barbourville, Kentucky, for Appellees.

————————————

**OPINION**
————————————

R. GUY COLE, JR., Circuit Judge.   Charles King, administrator of the estate of Patti Ann King; Amanda King, the Kings' daughter; and the Associated Insurance Companies (collectively "plaintiffs"), filed this suit against the Ford Motor Company and Mazda Motor Corporation (collectively "Ford").  Plaintiffs alleged that the passenger restraint system in the 1992 Ford Escort in which Patti Ann King was riding on August 21, 1994 was defective, causing her death. Following a jury verdict in favor of the plaintiffs, Ford raised several grounds for appeal.  For the following reasons, we **AFFIRM** the judgment of the district court.

————————————

\*    The Honorable Algenon L. Marbley, United States District Judge for the Southern District of Ohio, sitting by designation.

**VII.**

Ford finally claims that it is entitled to a new trial because the district court erred by excluding portions of testimony from two of Ford's experts, Roger Maugh and Geoff Germane.  Maugh would have testified that the 1992 Escort was not defective because it did not use a load limiter in its restraint system, and Germane would have testified that belt loads in the 1992 Hyundai Excel, which employed a load limiter, were actually higher than the belt loads in the 1992 Ford Escort.   The testimony purportedly would have demonstrated that load limiters were not feasible for the 1992 Escort.  The district court held that the experts' opinions were not admissible under Fed. R. Evid. 26 because Ford did not, within the allotted time window, disclose that the experts would testify about these matters.  This court reviews such a ruling for abuse of discretion.  *See Pedigo v. UNUM Life Ins. Co.*, 145 F.3d 804, 807 (6th Cir. 1998).

Fed. R. Evid. 26(a)(2)(B) provides, in part, that a party's disclosure regarding an expert witness must "contain a complete statement of all opinions to be expressed and the basis and reasons therefor."  Fed. R. Evid. 37(c)(1), in turn, provides that "[a] party that without substantial justification fails to disclose information required by Rule 26(a) . . . shall not, unless such failure is harmless, be permitted to use as evidence at a trial, at a hearing, or on a motion any witness or information not so disclosed."  Ford does not contend that, prior to trial, it disclosed that its experts would testify about load limiters in the Hyundai Excel; rather, it contends that it had substantial justification for failing to disclose and that, in any event, it would be fundamentally unfair to disallow the proffered testimony.  Ford claims that it was justified in failing to make the required disclosures under Rule 26 because the testimony in question was merely offered to rebut the "surprise" testimony of plaintiffs' expert, Syson, regarding

————————————

instruction on alternative design. *See Fulkerson*, 812 S.W.2d at 123-24. In fact, Kentucky's courts believe that this instruction may confuse juries as to the issues at stake under this doctrine. *See id.*

Since the time Kentucky adopted the doctrine of "strict liability" in products cases as stated in the Restatement, Second, Torts, § 402A, in the case of *Dealer's Transport Company v. Battery Distributing Company, Ky.*, 402 S.W.2d 441 (1966), the Kentucky practice has been to state the liability issue in the terms of Restatement: Did the defendant manufacture, sell or distribute the product "in a defective condition unreasonably dangerous to the user . . . ?"

. . .

In *Montgomery Elevator Co. v. McCullough*, Ky., 676 S.W.2d 776, 780-81 (1984), we stated:

"Considerations such as feasibility of making a safer product, patency of the danger, warnings and instructions, subsequent maintenance and repair, misuse, and the products' inherently unsafe characteristics, while they have a bearing on the question as to whether the product was manufactured 'in a defective condition unreasonably dangerous,' are all factors bearing on the principal question rather than separate legal questions."

A trial court is well advised to leave consideration of these evidentiary factors to the arguments of counsel rather than attempting to frame them up in the instructions on the ultimate questions. The language used may be confusing or misleading.

*Id*. The district court's instruction in this case tracked the language of the Restatement (Second) of Torts § 402A and the instruction approved by *Fulkerson*. It was therefore sufficient under Kentucky law, and we do not find that the district court committed reversible error in giving that instruction.[9]

---

[9]The trial court was not required, as a matter of federal law, to instruct on design defect. Although the appropriateness of the instructions is reviewed under federal procedural standards, the substance of the instructions to the jury should be based in state law. *See Persian Galleries, Inc.*, 38 F.3d at 257. The Kentucky courts have clearly stated that to fully expound the law on design defects, the jury need not hear an

## I.

On August 21, 1994, Patti Ann King, Ginger Brockman, and Erica Brockman were in Ginger Brockman's 1992 Ford Escort, approaching McKee, Kentucky at about thirty to thirty-five miles per hour. King was in the front passenger's seat, Ginger Brockman was driving, and Erica Brockman was in the back seat. A pickup truck traveling in the opposite direction, driven by sixteen-year-old Brian Coyle, unwisely attempted to turn in front of Brockman's car, into the driveway of a Dairy Freeze restaurant. The front of the Escort clipped the truck, causing a Delta V, or change in velocity, in the car on the order of twenty-seven miles per hour.

The Escort employed a "passive" or "automatic belt" restraint system in its front seats. The system consisted of a two-point motorized shoulder belt that automatically locked in place when the occupant closed her door; a knee bolster designed to restrain the lower torso;[1] and a manual lap belt. For a period of about six months, King had owned an Eagle Talon with a similar system, and she was described as an "avid seatbelt user." At the time of the accident, however, King was wearing only the automatic shoulder belt and not the manual lap belt. She apparently had the lap belt on earlier in the trip, but after her party stopped at the Gray Hawk store to buy a newspaper, she failed to re-engage it.

King suffered massive injuries in the accident – several fractured ribs and a fractured collar bone; lacerations to both lungs; and a tear to the left auricle of her heart. She ultimately died of a lack of oxygen to her brain as a result of her heart and lung injuries. King's estate alleged that her injuries were the result of defects in the Escort's restraint

---

[1]One of Ford's experts described the knee bolster as "just a big pad right down in the lower part of the instrument panel. And it was designed so that if you got in a frontal accident, the torso belt would hold the upper torso back but the lower torso would slide forward until the knees hit the bolster and the bolster would, in effect, provide a mechanism for absorbing energy in the lower torso. . . ."

system and filed suit against Ford in the United States District Court for the Eastern District of Kentucky on April 14, 1995.[2] It asserted diversity jurisdiction and brought state-law claims of negligence, strict liability, and breach of implied warranties. Associated Insurance Companies intervened to assert subrogation claims for medical expenses, and Amanda Sue King, King's daughter, intervened to assert loss of consortium claims.

Before the case proceeded to trial, Ford filed a motion for partial summary judgment, arguing that, to the extent plaintiffs asserted that the Escort was defective because it failed to contain an air bag, those claims were preempted by the National Traffic and Motor Vehicle Safety Act of 1966 ("Safety Act"), now codified[3] at 49 U.S.C. § 30101 *et seq.*, and regulations promulgated thereunder, *see* 49 C.F.R. § 571.208 (1999) ("Standard 208"). The district court granted this motion and plaintiffs' remaining claims were tried before a jury. At the close of plaintiffs' proofs, Ford filed a motion for judgment as a matter of law under Fed. R. Civ. P. 50, asserting that plaintiffs' claims were preempted in their entirety. The district court denied this motion. The case went to the jury on two distinct theories: that the "automatic seat belt restraint system was defective and unreasonably dangerous to the consumer" and that Ford failed to warn consumers of the potential dangers associated with the restraint system. After first being sent back for further deliberations after returning inconsistent answers to interrogatories, the jury found Ford liable on both claims and

---

[2]Neither Ginger Brockman nor Brian Coyle were parties to this action. Their insurance companies settled the Kings' claims against them.

[3]The Safety Act was originally codified at 15 U.S.C. § 1381 *et seq.* Congress recodified the act in 1994, "'without substantive change' to the underlying provisions." *Geier v. American Honda Motor Co.*, 166 F.3d 1236, 1237 n.2 (D.C. Cir.), *cert. granted*, 120 S. Ct. 33 (1999).
.

*see also Schrand*, 1999 WL 540877, at *2 (defining duty as "the exercise of ordinary care to prevent foreseeable injury from occurring to another person"). We therefore find that the district court did not abuse its discretion by failing to give the requested instruction.

## B.

Ford next contends that, with regard to plaintiffs' design defect claim, that the district court erred by failing to give an instruction on alternate feasible designs – that is, an instruction that the jury should determine whether there was an alternate restraint-system design available at the time the Escort was manufactured and whether a reasonably prudent manufacturer would have used this alternative. The court's design-defect instruction was as follows:

In order to recover under her [sic] design defect claim, the plaintiffs must establish two essential elements as follows:
First, that when the 1992 Ford Escorts left the possession of the defendants, the design of the automatic seat belt restraint system was defective and unreasonably dangerous to the consumer.
And second, that the unreasonably dangerous, defective condition of the machine was a substantial factor in causing the injury and death of Patti King.
As the term is used in this instruction, a design is defective and unreasonably dangerous if it creates such a risk of accidental injury to a prospective user that an ordinarily prudent company engaged in the manufacture of similar products, being fully aware of the risk, would not have put it on the market.

In *Ford Motor Co. v. Fulkerson*, 812 S.W.2d 119, 122-24 (Ky. 1991), the Kentucky Supreme Court specifically approved for use in product liability actions the very type of bare-bones design-defect instruction used by the district court in this case. The *Fulkerson* court wrote:

the safety purpose for the belt." *See Miller's Bottled Gas, Inc. v. Borg-Warner Corp.*, 56 F.3d 726, 736 (6th Cir. 1995) ("[T]rial court may refuse to instruct the jury on an issue when there has been insufficient evidence presented to support a jury finding on that issue."); *Laugesen v. Anaconda Co.*, 510 F.2d 307, 314 (6th Cir. 1975) (stating that trial court had no obligation to instruct on a theory not pleaded by a party and not supported by evidence); *cf. Wagner v. Case Corp.*, 33 F.3d 1253, 1258 (10th Cir. 1994) (approving the refusal to give a jury instruction, in a Colorado diversity case, where party requesting instruction offered "vague" evidence to support its argument).

Although Ford introduced evidence and argued as to King's regular use of a seat belt, none of the evidence adduced by Ford indicated that King was aware of the danger of potential injuries, or worsened injuries, from the use of the shoulder belt alone. *See Demaree v. Toyota Motor Corp.*, 37 F. Supp. 2d 959, 967 (W.D. Ky. 1999) (applying Kentucky law and finding no duty to warn because the plaintiff explicitly testified that she knew of the danger of the car's air bag). Nor had Ford pointed to any objective evidence that this danger was a matter of common knowledge. *See Leonard v. Uniroyal*, 765 F.2d 560, 564 (6th Cir. 1985).

"A judgment may be reversed only if the instructions, viewed as a whole, were confusing, misleading, or prejudicial." *Beard v. Norwegian Caribbean Lines*, 900 F.2d 71, 72-73 (6th Cir. 1990). This was not the situation in the present case. We further note that the district court gave an instruction stating that in order for the plaintiffs to recover on a failure-to-warn theory, Ford's failure to provide an adequate warning had to be a substantial factor in causing the decedent's injuries. Although this instruction goes to causation rather than duty, it adequately conveys the intent of Ford's requested instruction: if King had already been fully apprized of the need to wear the lap belt – that is, she was aware of the danger from not doing so – Ford's failure to warn King obviously could not have played a substantial factor in causing her death. *See Leonard*, 765 F.2d at 566 n.5;

awarded damages in the amount of $1,848,109.84.[4]  Ford renewed its motion for judgment as a matter of law and filed a motion for a new trial, both to no avail.  This timely appeal followed.

## II.

Ford first argues that plaintiffs' claims are preempted by federal law.  This court generally reviews a district court's decision with regard to preemption *de novo*.  *See GTE Mobilnet v. Johnson*, 111 F.3d 469, 475 (6th Cir. 1997).

The Supremacy Clause of the United States Constitution provides that federal law "shall be the supreme Law of the Land . . . any Thing in the Constitution or Laws of and State to the Contrary notwithstanding."  U.S. Const. art. VI.  Thus, as has been clear since the Supreme Court's decision in *M'Culloch v. Maryland*, 17 U.S. 316 (1819), any state law that conflicts with federal law is "without effect."  *Cipollone v. Ligget Group, Inc.*, 505 U.S. 504, 516 (1992) (citing *Maryland v. Louisiana*, 451 U.S. 725, 746 (1981)).

In applying the Supremacy Clause, courts "start with the assumption that the historic police powers of the States [are] not to be superseded by [a] Federal Act unless that was the clear and manifest purpose of Congress."  *Medtronic v. Lohr*, 518 U.S. 470, 485 (1996) (citing *Rice v. Santa Fe Elevator Corp.*, 331 U.S. 218, 230 (1947)).  Therefore, "'[t]he purpose of Congress is the ultimate touchstone' in every pre-emption case."  *Id.* (citing *Cipollone*, 505 U.S. at 516).  The Supreme Court has stated that Congress may make its intent to preempt clear either expressly or implicitly.  *See Freightliner Corp. v. Myrick*, 514 U.S. 280, 287 (1995).  Implied preemption, in turn, takes two forms.  "We have found implied conflict pre-emption where it is impossible for a private party to

---

[4]The jury apportioned fault as follows:  Ford, 65%; Brian Coyle, 20%; Patti King, 10%; Ginger Brockman, 5%.  The estate recovered $823,172.58, Amanda Sue King recovered $975,000.00, and Associated Insurance Cos. recovered $49,937.58.

comply with both state and federal requirements, or where state law stands as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress." *Id.* (internal citations and quotations omitted). In summary, then, there are three types of preemption – express preemption, implied conflict preemption, and implied field preemption.

Ford's argument revolves around the Safety Act, and Standard 208 promulgated thereunder. The Safety Act authorizes the Secretary of Transportation to promulgate Federal Motor Vehicle Safety Standards ("FMVSS"). *See* 49 U.S.C. § 30101. When an FMVSS is in effect, "a State or a political subdivision of a State may prescribe or continue in effect a standard applicable to the same aspect of performance of a motor vehicle or motor vehicle equipment only if the standard is identical to the standard prescribed under this chapter." 49 U.S.C. § 30103(b). However, the act also contains a savings clause, which provides that "[c]ompliance with a motor vehicle safety standard prescribed under this chapter does not exempt a person from liability at common law." 49 U.S.C. § 30103(e).

The Secretary's Standard 208, promulgated pursuant to the Safety Act, requires passenger cars manufactured after September 1, 1989 but before September 1, 1993, like the Escort in this case, to comply with one of three front-seat-occupant crash-protection options: (1) a complete passive restraint system; (2) a passive system (automatic seat belts or air bags) for frontal crash protection, manual belts for lateral crashes and rollovers, and a warning system; or (3) manual front seat belts with a warning system. *See* 49 C.F.R. § 571.208, S4.1.4-S4.1.4.2.2. Ford used option 2 -- an automatic shoulder belt and knee bolster to protect against frontal collisions, a manual lap belt to protect against lateral crashes and rollovers, and a warning system.

Ford's position is that implied conflict preemption applies in this case. It argues that "[b]ecause federal policy [i.e. the Safety Act and Standard 208] affirmatively required that these three options be available to manufacturers, a state rule which

court characterized the requested instruction as a "legal standard," and, as such, not a necessary jury instruction. This characterization is consistent with the Kentucky Supreme Court's indication that, under Kentucky tort law, the issue of whether a defendant has a duty to a plaintiff is generally a question of law to be resolved by the trial court. *See Mullins v. Commonwealth Life Ins. Co.*, 839 S.W.2d 245, 248 (Ky. 1992) ("The question of duty presents an issue of law."); *Sheehan v. United Service Auto. Assoc.*, 913 S.W.2d 4, 6 (Ky. Ct. App. 1996); *Schrand v. Grant*, No. 1997-CA-001996-MR, 1999 WL 540877, at *2 (Ky. Ct. App. July 2, 1999).

In any event, Ford failed to present sufficient evidence warranting such an instruction. Contrary to Ford's suggestion on appeal, the absence of a duty to warn was not its theory of the case. Instead, Ford consistently argued that its warnings were adequate, a distinct issue from a lack of a duty to warn. For example, Ford did not plead a lack of a duty to warn in its response to King's complaint. Likewise, in opening arguments, Ford did not state that it would argue that it had no duty to warn. Rather, Ford told the jury, after stating that its warnings were adequate, that it would show that King wore her seat belt and knew she ought to wear her seat belt, supportive evidence for its argument that it adequately warned King. Evidence in the case did in fact indicate that King was an avid seat belt user, had previously worn the lap belt in Brockman's Escort, and had briefly owned an Eagle Talon with a restraint system similar to that in the 1992 Escort. Ford only raised the issue of a lack of a duty to warn when it moved for a directed verdict on that basis, to which the trial court responded, correctly, "I don't know of any testimony as to her knowledge of the danger of the product."

The jury instructions initially submitted to the court by Ford did not include one stating that Ford did not have a duty to warn of a known danger. It was only after the district court had finalized the charge when Ford requested the addition of an instruction with this language. In its closing, Ford argued that the court would instruct the jury that "there is a duty to warn a person of unknown danger" and that "King knew of

prejudicial"). Therefore, the district court had the option of seeking guidance from Kentucky practice in formulating the jury instructions.[8]  In fact, a federal court's consideration of a state's jury instruction practice may insure that the instructions correctly express state substantive law.  *See Laney*, 901 F.2d at 1321; *cf. Rhea v. Massey-Ferguson, Inc.*, 767 F.2d 266, 269 (6th Cir. 1985) (noting that in Michigan the standard instructions must be given, and stating that "[t]he district court had no duty to give the additional requested instructions if the standard instructions, viewed as a whole, fairly and accurately describe" state law).  Finally, even if a district court errs by failing to give a requested instruction, we will not reverse when the error is harmless.  *See United States v. Toney*, 161 F.3d 404, 412-13 (6th Cir. 1998), *cert. denied*, 526 U.S. 1045 (1999).

### A.

Ford contends that the district court erred by failing to give an instruction stating that it had no duty to warn of known dangers.  Such an instruction would have been an accurate general statement of Kentucky law.  *See Hutt*, 914 F.2d at 793 (stating that under Kentucky law, "[t]here is no duty on the part of a manufacturer to warn the user of a product when the user is aware of the product's danger").

The trial court rejected Ford's request to add a jury instruction providing that "the defendants had no duty to warn if Patti King knew of the lap belt and was aware of the reasons for wearing it."  In denying the request, the district

---

[8]We recognize that two of our cases – one in unelaborated dicta and the other unpublished – suggest that the federal district court is not *required* to follow the Kentucky bare bones practice.  *See Robinson v. Ralph G. Smith, Inc.*, 735 F.2d 186, 192 n.9 (6th Cir. 1984); *Whitescarver v. Wal-Mart Stores, Inc.*, No. 92-5197, 1992 WL 393172, at *3 (6th Cir. Dec. 29, 1992).  Even if we were to consider either of these cases binding, a district court is still free to look to a state's model jury instructions and other authority to insure it properly instructs the jury under substantive state law.

found civil liability for using one of the equipment options rather than another would be preempted."  State tort law removing one option would obviously be "an obstacle to the accomplishment and execution of the full purposes and objectives of Congress," namely the objective that manufacturers have flexibility in choosing a restraint system.  *Hines v. Davidowitz*, 312 U.S. 52, 67 (1941).  Ford contends that plaintiffs' suit would limit this flexibility, as the company characterizes plaintiffs' suit as one claiming that two-point, automatic seatbelts with manual lap belts are inherently defective.  *See Irving v. Mazda Motor Corp.*, 136 F.3d 764, 768-69 (11th Cir. 1998) (holding such a claim preempted).

We agree with plaintiffs, however, that Ford has misconstrued their case.  As plaintiffs note:

> In the case at bar . . . plaintiffs' position was not that the design choice made by defendants for protecting against frontal collisions – an automatic shoulder belt and knee bolster – was inherently defective but that the specific design was defective due to failure to use load limiters and/or change the location of the knee bolster and/or change the location of the belt anchor.

Such a claim is not preempted by the Safety Act.  The FMVSS provide only the "minimum standard[s] for motor vehicle or motor vehicle equipment performance." 49 U.S.C. § 30102(a)(9).  The Safety Act's savings clause, which states that compliance with an FMVSS does not shield a manufacturer from liability at common law, contemplates that manufacturers may be held liable for failure to exceed these minimum standards when their decisions were unreasonable.  This is the essence of plaintiffs' claims.

We find *Perry v. Mercedes Benz of North America, Inc.*, 957 F.2d 1257 (5th Cir. 1992), to be analogous to this case.  There, plaintiff alleged that the air bag in her car had "an unreasonably dangerous 'deceleration velocity deployment threshold'" despite the fact that it met the requirements of Standard 208.  *Id*. at 1260.  In other words, plaintiff did not challenge Mercedes's decision to place an air bag in its cars,

but rather argued that the air bag should have been safer than required by federal law. After finding that express preemption did not apply, the court held that implied conflict preemption did not apply either. As an initial matter, the court found it "obvious" that there was no impossibility of complying with both federal and state law – if state law required a higher level of protection than federal law, a system that complied with state requirements would satisfy federal regulations a fortiori. The court also found that the differing levels of protection did not create an obstacle to the fulfilment of federal objectives.

> Once the manufacturer chooses an option that includes an air bag system, Standard 208 S5-S6 merely set forth minimum performance requirements for that system. To allow tort liability for the design of that system would not remove or require any particular choice, or otherwise frustrate "flexibility" that the federal scheme provides. We recognize that the manufacturer who chooses to meet only the bare minimum performance requirements will be burdened with the potential for tort liability, but this is the exact burden that Congress preserved in the Savings Clause, when it stated that "[c]ompliance with any Federal motor vehicle safety standard . . . does not exempt any person from any liability under common law." Congress sought to meet its goal of minimizing the number of deaths and injuries caused by auto accidents by setting forth minimum standards and leaving common law liability in place.

*Id*. at 1265-66. The court thus held that plaintiff's claim was not preempted. *See id*; *see also Pokorny v. Ford Motor Co.*, 902 F.2d 1116, 1126 (3d Cir. 1990) ("Ford's argument that we . . . should simply hold that all safety alternatives not included in Standard 208 are pre-empted does not persuade us."); *Collazo-Santiago v. Toyota Motor Corp.*, 957 F. Supp. 349, 353 (D.P.R.1997) ("[C]ompliance with performance criteria does not immunize manufacturers from common law liability arising from any defects in the production or design of their passive restraint systems."); *cf. Sours v. General*

901 F.2d 1319, 1321 (6th Cir. 1990) (citing *Williams v. Union Carbide Corp.*, 790 F.2d 552 (6th Cir. 1986)).

"Kentucky follows the 'bare-bones' principle in providing instructions." *McGuire v. Commonwealth of Kentucky*, 885 S.W.2d 931, 936 (Ky. 1994); *see also DSG Corp. v. Anderson*, 754 F.2d 678, 681-82 (6th Cir. 1985). That is, the jury instructions "should not contain an abundance of detail, but should provide only the bare bones of the question for jury determination. This skeleton may then be fleshed out by counsel on closing argument." *Ball v. E.W. Scripps Co.*, 801 S.W.2d 684, 691 (Ky. 1990) (citing *Rogers v. Kasdan*, 612 S.W.2d 133, 136 (Ky. 1981)). The Kentucky Supreme Court has stated that:

> In conclusion, it may be well to mention that whenever counsel feels that jurors might draw inferences that are not warranted by the specific terminology of the instructions, his opportunity to guard against it comes in the closing argument. If instructions are to be kept concise and to the point, as they should be, their supplementation, elaboration and detailed explanation fall within the realm of advocacy. Contrary to the practice in some jurisdictions, where the trial judge comments at length to the jury on the law of the case, the traditional objective of our form of instructions is to confine the judge's function to the bare essentials and let counsel see to it that the jury clearly understands what the instructions mean and what they do not mean.

*Young v. J.B. Hunt Transp., Inc.*, 781 S.W.2d 503, 506-07 (Ky. 1989) (quoting *Collins v. Galbraith*, *Ky.*, 494 S.W.2d 527, 531 (Ky. 1973)).

In sum, the federal district court had discretion to instruct the jury in any manner it deemed appropriate, as long as it correctly stated Kentucky's substantive law, instructed on the issues relevant to the case at hand, and did not mislead the jury. *See Davis v. Mutual Life Ins. Co.*, 6 F.3d 367, 373 (6th Cir. 1993) (requiring reversal "only where the instructions, considered as a whole, are confusing, misleading, or

this case, the district court's limited questioning of Juror 12 was proper and not coercive.[7]

## VI.

Ford next contends it is entitled to a new trial because the district court erred by failing to give two of its requested instructions.  This court reviews a district court's refusal to give requested jury instructions under an abuse of discretion standard.  *See Buziashvili v. Inman*, 106 F.3d 709, 715 (6th Cir. 1997).  We review jury instructions "as a whole in order to determine whether [the instructions] adequately inform the jury of relevant considerations and provide a basis in law for aiding the jury to reach its decision." *Gafford v. General Elec. Co.*, 997 F.2d 150, 166 (6th Cir. 1993) (quoting *Beard v. Norwegian Caribbean Lines*, 900 F.2d 71, 72 (6th Cir. 1990)).

In a diversity action, state law determines the substance of the jury instructions; however, questions regarding the propriety of the instructions are governed by federal procedural law.  *See Persian Galleries, Inc. v. Transcontinental Ins. Co.*, 38 F.3d 253, 257 (6th Cir. 1994). In addition, trial courts have broad discretion in framing jury instructions. *See United States v. Moore,* 129 F.3d 873, 876-77 (6th Cir. 1977); *see also Scamardo v. Scott County*, 189 F.3d 707, 711 (8th Cir. 1999); *Jennings v. BIC Corp.*, 181 F.3d 1250, 1254 (11th Cir. 1999).  "It is the better practice for a federal court sitting in diversity to use state approved jury instructions" in order to accurately instruct the jury on the appropriate state substantive law. *Laney v. Celotex Corp.*,

---

[7]Ford also argues that the form of the question used by the district court – asking whether Juror 12 agreed with the verdict – was improper and that the question was "legally meaningless."  This argument is without merit.  If a trial court decides to poll the jury, it has substantial discretion in determining the manner of polling. *See Audette*, 789 F.2d at 959-60.  "Unless the trial judge's interrogation serves to coerce a reluctant juror into changing his vote, any formulation that [serves to ascertain that the verdict was unanimous] is permissible." *Green v. Zant*, 738 F.2d 1529, 1537-38 (11th Cir. 1984).

*Motors Corp.,* 717 F.2d 1511, 1516-17 (6th Cir. 1983) ("[T]he very federal safety statute upon which GM relies makes it abundantly clear that compliance with the regulations promulgated thereunder does not immunize a manufacturer from common law liability." (citing 15 U.S.C. § 1397(c) (1976))).  We hold that the plaintiffs' claims in this case similarly are not preempted.

## III.

Ford next argues that plaintiffs' evidence was insufficient to support a verdict on either their product defect theory or their failure-to-warn theory.  In diversity cases, this court applies a state-law standard of review to motions for judgment as a matter of law which challenge the sufficiency of the evidence necessary to support the jury's verdict. *See Morales v. American Honda Motor Co.*, 151 F.3d 500, 506 (6th Cir. 1998).  Under Kentucky law, the applicable standard of review is as follows:

> Under Kentucky law, a motion for a directed verdict – the same thing as a motion for judgment as a matter of law under Rule 50, Fed. R. Civ. P. – should be granted only if "there is a complete absence of proof on a material issue in the action, or if no disputed issue of fact exists upon which reasonable minds could differ." *Washington v. Goodman*, 830 S.W.2d 398, 400 (Ky. App. 1992).  In deciding such a question, "every favorable inference which may reasonably be drawn from the evidence should be accorded the party against whom the motion is made." *Baylis v. Lourdes Hosp., Inc.*, 805 S.W.2d 122, 125 (Ky. 1991).

*Id*. (quoting *Adam v. J.B. Hunt Transp., Inc.*, 130 F.3d 219, 231 (6th Cir. 1997)).

## A.

We turn first to the sufficiency of the evidence in plaintiffs' product defect claim. Following the Restatement (Second) of Torts § 402A, Kentucky imposes strict liability when the

"'design itself selected by the manufacturer amounted to a defective condition which was unreasonably dangerous.'" *Morales v. American Honda Motor Co.*, 71 F.3d 531, 536 (6th Cir. 1995) (citing *Nichols v. Union Underwear Co.*, 602 S.W.2d 429, 433 (Ky. 1980)). The plaintiff has the burden, however, to establish causation under the substantial factor test – that is, plaintiff must prove that the defendant's conduct was a substantial factor in bringing about plaintiff's harm. *Id.* at 537 (citing *Deutsch v. Shein*, 597 S.W.2d 141, 144 (Ky. 1980); *Huffman v. SS. Mary & Elizabeth Hosp.*, 475 S.W.2d 631, 633 (Ky. 1972)). Plaintiff may use circumstantial evidence, and "in that situation, 'the evidence must be sufficient to tilt the balance from possibility to probability.'" *Id.* (citing cases).

Ford contends that "the plaintiffs here presented no testimony upon which a jury could find that King's injuries were caused by belt loading that exceeded her tolerances. That was left to sheer speculation and surmise." Ford focuses on the testimony of two of plaintiffs' experts, Syson and Lafferty. Syson testified that King would have had a belt load of 1,100 to 1,300 pounds during the accident and that this was "right at her tolerance level," as a 138 lb. woman. Ford also claims that Lafferty testified that a woman's tolerance level is higher than 1,100 to 1,300 lbs. Thus, the company contends that neither testified that the belt load in this case exceeded the decedent's tolerance level. Ford therefore contends that plaintiffs failed to prove causation in this accident.

We reject this argument. As an initial matter, Ford distorts Lafferty's testimony. Ford claims that "Dr. Lafferty testified that the human tolerance belt loads *for a female* would range between 1,400-1,600 pounds." In reality, Lafferty testified, consistent with Syson, that this 1,400-1,600 lb. figure represented the average tolerance level for "a 50 percentile male." Lafferty did not give a figure for the average woman's tolerance level – or for the decedent's tolerance level, for that matter – but did testify that the thresholds are lower for women than for men. Second, as plaintiffs note, the evidence indicated that "there is great variation from one person to the

31(d); *Grossheim v. Freightliner Corp.*, 974 F.2d 745, 752-53 (6th Cir. 1992) (affirming grant of new trial when polling revealed that juror only assented to verdict so that she "could go home"). There is a line of cases from other circuits that holds that it is error for a district court to force a juror who has expressed reluctance with a verdict during a jury poll to cast his or her vote in open court without further deliberation in the jury room. *See, e.g., United States v. Edwards*, 469 F.2d 1362, 1366 (5th Cir. 1972) (finding reversible error when judge demanded that juror state whether or not the verdict was hers when she initially indicated that the verdict was hers, but that she was "still in doubt"). However, a judge's limited questioning of a juror regarding a poll answer is not coercive or otherwise erroneous if used simply to clear up ambiguity in the juror's answer. *See id.* at 1367 n.5 (finding a "limited exception to the bar of questioning from the bench" when it is apparent that the juror was confused about a poll question or when the "juror's dissent has resulted from an inadvertent slip of the tongue"); *Williams v. United States*, 419 F.2d 740, 746 (D.C. Cir. 1969) ("There is a distinction in law and in fact between actions of the trial judge to obtain clarity in place of confusion, and actions that produce a likelihood that a juror has been coerced."). Here, the situation that precipitated the district court's questions was confusing. The jury was leaving the courtroom, the judge's microphone was not on at first, and there is some indication that Juror 12 was having trouble hearing the judge. Furthermore, the district court stated, in denying Ford's motion for a new trial based on this issue, that Juror 12 appeared "perplexed." *See United States v. Brooks*, 420 F.2d 1350, 1353 (D.C. Cir. 1969) (noting that "the trial judge is in a much better position than an appellate tribunal to determine whether a recalcitrant juror's eventual acquiescence in a verdict was in fact freely given"). Under the circumstances of

whether the verdict represented his or her answer.[6]  Rather than answering yes or no, Juror 12 answered "Here."  The court apparently thought that all of the jurors had said yes, and dismissed the jury.  As the members were leaving, however, the court reporter alerted the court to Juror 12's anomalous answer.  The court stopped the jury, and the following exchange occurred:

> THE COURT:  All right.  I need to know from you whether the verdict that was rendered represents your own verdict.  Yes or no?
> A JUROR:  No.
> THE COURT:  I'm sorry?
> A [DIFFERENT] JUROR:  He can't hear you.
> THE COURT:  I'm sorry I don't have the microphone on.  I need to know whether the verdict that was returned represents your verdict?
> A JUROR:  No.
> THE COURT:  Do you by saying no, are you saying that you do not agree with the verdict?
> A JUROR:  I agree with it, yeah, all of it.
> THE COURT:  All right.  What do you mean when you say that you say it's not your verdict?  I just want to know if you agree with it or not agree with it.
> A JUROR:  I agree with it, what we put down.

Ford's position is that the court coerced Juror 12 into giving his consent to the verdict.  Generally, the proper procedure when a poll indicates that unanimity with a verdict is uncertain is to return the jury to the jury room for further deliberations or to declare a mistrial.  *Cf.* Fed. R. Crim. P.

---

[6]Under Fed. R. Crim. P. 31(d) a party in a criminal case has the right to have the jury polled.  Although jury polling clearly does take place in civil trials, *see, e.g., Grossheim*, 974 F.2d at 748, there is no express provision for polling in the Federal Rules of Civil Procedure.  *See Audette v. Isaksen Fishing Corp.*, 789 F.2d 956, 959 (1st Cir. 1986).  It is apparently an unsettled question as to whether a party has a right to demand a jury poll in a civil case.  *See id.*  In any event, in civil cases when there are questions as to polling procedure, courts apparently look to criminal cases for guidance.  *See, e.g., id.* at 958-60.

---

next" with regard to the amount of force that they can tolerate.  Therefore, one should not interpret Syson's statement that the belt loads were "right at her tolerance level" as an indication that the belt loads did not exceed the decedent's tolerance level.  Finally, circumstantial evidence strongly supports the plaintiffs' case.  After the accident, the decedent was found turning blue with the seat belt cutting into her neck and chest.  The belt had to be cut to relieve the pressure.  There is testimony that her injuries were typical of those caused by restraint systems.  Additionally, plaintiffs' experts eliminated other possible sources -- there was no evidence that the decedent impacted the windshield or the dashboard, with the exception of her hand and possibly her knee.  There was certainly sufficient evidence in this case whereby a jury could have concluded that decedent's injuries were caused by excessive belt loads.

### B.

Ford also contends that there was insufficient evidence for the jury to find that the warnings in the 1992 Escort were defective and a substantial factor in causing the decedent's injuries.  Specifically, Ford claims that the evidence in the case demonstrates that the danger of not wearing the lap belt was known to the decedent and that the warnings located in the Escort as to that danger were adequate.

Ford is correct that in Kentucky there is no duty to warn of a known danger.  *See Hutt v. Gibson Fiber Glass Prods., Inc.*, 914 F.2d 790, 793 (6th Cir. 1990); *Demaree v. Toyota Motor Corp.*, 37 F. Supp. 2d 959, 967 (W.D. Ky. 1999).  The evidence here demonstrated that the decedent was an avid seat belt user and that she had in fact been wearing the lap belt in the Escort earlier in the day.

The jury, however, may have permissibly concluded from the evidence in this case that the decedent was aware that not wearing the lap belt would reduce the effectiveness of the restraint system in preventing injuries caused by hitting the dashboard or the like, but that she was not aware that the failure to wear the belt could lead to deadly injuries caused by

the shoulder harness, even in a relatively minor accident. Therefore, we cannot conclude, as a matter of law, that the decedent was aware of the danger involved in this case.

Nor can we conclude that the Escort's warnings were adequate as a matter of law. The warning located on the Escort's visor stated:

IMPORTANT FOR YOUR SAFETY
Following these instructions will greatly improve your chances of avoiding severe injury in case of an accident. Be sure the shoulder belt buckle is engaged.
Always wear your lap belt when the car is moving. If a lap belt cannot be worn, you should move the seat forward so your knees are as close to the instrument panel as possible.

Under Kentucky law, a warning "must be fair and adequate, to the end that the user, by the exercise of reasonable care on his own part, shall have a fair and adequate notice of the possible consequences of use or even misuse." *Post v. American Cleaning Equip. Corp.*, 437 S.W.2d 516, 520 (Ky. App. 1968) (citing 76 A.L.R.2d 9, 37 (1961)). While the warning in this case does indicate that following its advice will "improve your chances of avoiding severe injury in case of an accident" it does not indicate that misuse could lead to severe injury caused by the shoulder belt itself. It was certainly within the jury's prerogative to conclude that the warning in this case did not adequately convey the dangers involved. *Post* provides:

As an example, it may be doubted that a sign warning, "Keep off the Grass," could be deemed sufficient to apprise a reasonable person that the grass was infested with deadly snakes. In some circumstances a reasonable man might well risk the penalty of not keeping off the grass although he would hardly be so daring if he knew the real consequences of his failing to observe the warning sign. Or, a warning to "Keep in a Cool Place" might not be sufficient if the result of nonobservance was a lethal explosion of the container.

*Id.* at 520. We affirm the district court on this issue.

### IV.

Ford next argues that the district court erred by failing to order a new trial when the jury returned with inconsistent interrogatory answers. Fed. R. Civ. P. 49(b) provides that when the jury so returns, the court should send the jury back for further deliberations or order a new trial. Ford moved for the latter, but the district court did the former.

This issue requires little discussion. "In deciding at what point further deliberations by a particular jury would be fruitless or unduly coercive, the trial judge has wide discretion." *United States v. Stevens*, 177 F.3d 579, 583 (6th Cir. 1999). Ford provides absolutely no case law or reasoning to support its claim that resolving the inconsistency in the jury's initial answers to the interrogatories required not merely a correction, but a change in the jury's conclusions. *Cf. United States v. Vazquez-Rivera*, 135 F.3d 172, 177 (1st Cir.1998) ("Painting black lines on the sides of a horse and calling it a zebra does not make it one.").

### V.

Ford next argues that it was entitled to a new trial because of defects in the jury verdict. This court reviews for abuse of discretion a district court's denial of a motion for a new trial. *See United States v. Rapanos*, 115 F.3d 367, 372 (6th Cir. 1997).

Ford claims that the verdict in this case was not unanimous.[5] After the jury returned following further deliberations, each member of the jury was polled as to

---

[5]The verdict had to be unanimous in this diversity civil case because the court gave a unanimity instruction. *See Grossheim v. Freightliner Corp.*, 974 F.2d 745, 753 (6th Cir. 1992).