**Donnie STEVENS and Teresa Stevens, Plaintiffs–Appellants,**

v.

**Keller LADDERS, et al., Defendants–Appellees.**

No. 99–6127.

United States Court of Appeals, Sixth Circuit.

Jan. 12, 2001.

---

Before BATCHELDER and COLE, Circuit Judges; and GRAHAM, District Judge.*

GRAHAM, District Judge.

Plaintiffs-appellants Donnie and Teresa Stevens ("plaintiffs") appeal the order of the district court in this products liability action, in which the court, pursuant to Fed.R.Civ.P. 50(a)(1), granted the motion for judgment as a matter of law of defendants-appellees Keller Ladders, et al. ("Keller"). On appeal, plaintiffs argue that they presented sufficient evidence to overcome Keller's motion and that the trial court erred in removing the case from the jury's consideration. For the reasons set forth below, the judgment of the district court is REVERSED.

## I.  FACTS

Mr. Stevens purchased a twenty-foot Keller aluminum extension ladder in July, 1991. He used the ladder several times each year, both in his personal capacity and in his capacity as a self-employed maintenance person. On April 12, 1996, Mr. Stevens and his employee, Bill Metzler, went to a customer's home to clean the roof gutters of leaves and debris. In order to clean the gutters, Mr. Stevens had to use the ladder in its extended mode. Mr. Stevens placed the ladder on the pavement of the driveway, which was dry and unobstructed, and positioned it on the side of the house. From this position, he fully extended the ladder.

Mr. Stevens's ladder was a "rear fly" extension ladder, which means the "fly section" of the ladder was behind the base.[1] In order to extend the ladder, he had to push the "fly section" of the ladder upwards until it reached the desired height. Upon reaching the desired height, it was necessary to engage the rung locks in order for the fly section of the ladder to stay in the desired position. The rung locks are engaged or "locked" when they sit firmly atop a rung. If the rung locks are not properly engaged, the weight of a user may cause the extended portion of the ladder to slide downward or "telescope."

The ladder contained a warning, which stated "make sure all locking devices are secure." Stevens trans., Jt. App. at 109. Stevens testified that while standing on the ground, it was impossible for him to visually determine if the rung locks were engaged because they were not within sight.[2] He explained that it was his cus-

---

* The Honorable James L. Graham, United States District Judge for the Southern District of Ohio, sitting by designation.

1. The "fly section" of an extension ladder is the part of the ladder that can be raised in order to expand the ladder's maximum height.

2. In its brief, Keller states that a person standing on the ground could determine visually if the rung locks were engaged by looking "from the rear of the ladder or through the simple act of turning the ladder around before climbing it[.]"  Keller Brief at 3 (citing Wallick's trial testimony).

In fact, Mr. Wallick did not state that a person could see the rung locks by simply looking behind the ladder.
   Q.  Well, sir, if one has to make sure the ladder locks are locked and all one has to do is look slightly behind the ladder, you can see whether or not the ladder locks are locked can [sic] you?
   A.  I don't think in the case of this ladder that's really possible.
Jt.App. at 334–35. Wallick did state, however, that if a person picked up the ladder and turned it around, that person may be able to determine visually if the locks were engaged.
   Q.  Would you explain to the jury why it's not possible for a ladder user to tell wheth-

tom to extend the fly section to the level at which the rung locks would be slightly above the desired rung and then allow the fly section to drop down, thereby causing the rung locks to engage at the desired point. Stevens stated that he knew when the locks were engaged when he heard an audible "click" and "felt" the locks engage.

After extending the fly section of the ladder and believing that the rung locks were properly engaged, Mr. Stevens climbed the ladder and positioned himself on the extended fly section approximately five or six rungs from the top of the ladder. Once positioned, he took a gutter nail and attempted to hammer it through the gutter. However, the first time he struck the nail, the ladder went straight down or "telescoped," causing him to fall to the ground. As a result of the fall, Stevens was severely injured and he has incurred medical expenses in excess of $125,000.

Plaintiffs claim that the accident was caused by a design defect in the Keller ladder, which made it difficult or impossible to determine whether the rung locks were securely engaged before climbing the ladder. They filed this action under the Kentucky Products Liability Act. At trial they claimed that the Keller ladder can and will go into a false lock configuration ("false lock"). According to plaintiffs' expert witnesses, a false lock occurs when the ladder is in its extended position and appears to be locked in that position, but, in reality, the locks are not completely engaged. Specifically, Mr. Wallick testified that "people get the feeling that [the rung locks] are locked, but they're not really completely engaged with the ladder to make a correct locking position." Jt. App.

at 292. While in false lock, the ladder can support the weight of the user, thereby leading the user to believe mistakenly that it is safe to climb. However, a slight disturbance or jolt to the ladder may cause the false lock to fail, and when this occurs the extended portion of the ladder collapses or "telescopes." It is plaintiffs' belief that at the time of the accident, the ladder was in false lock and that the false lock disengaged when Stevens struck the gutter nail. In ruling on Keller's motion for judgment as a matter of law, the court assumed that the jury could have found that the accident was caused by the telescoping of the ladder while it was in a "false lock" configuration.

Plaintiffs argued that the inherent defect with the ladder's design was that the operator of the ladder was unable to visibly determine if the rung locks were properly engaged while standing on the ground. As a result, Mr. Stevens resorted to the technique of feeling and listening for the rung locks to engage, which failed to alert him to the fact that the ladder was in a false lock configuration. Plaintiffs argue that this design was defective because it exposed the operator to the risk of injury by climbing the ladder when the rung locks were not properly engaged. Plaintiffs contended that there were other ladder designs that allowed a person to stand on the ground and visibly determine if the rung locks were engaged.

At trial, plaintiffs introduced the testimony of Mr. Stevens; plaintiffs' employee, Mr. Metzler; and two expert witnesses, Dr. Johnson and Mr. Wallick.

er this type of ladder is properly locked even if you looked at it from the rear?
A. If I looked at it from the rear?
Q. Yes, sir.
A. You mean, actually turned the ladder around and looked at it?

Q. Yes, sir.
A. I would say then you would be able to tell, but that's not the way you set the ladder up.
*Id.* at 343–44.

Dr. Johnson is a professor of material science, failure analysis, and accident reconstruction. He explained that his task was to determine how the accident might have occurred, but not to actually reconstruct the accident. For this task, Dr. Johnson was required to locate an exemplar ladder, as the ladder in question was too damaged to use. He located a Keller extension ladder that was almost identical to the ladder in question; the major difference was that the exemplar ladder was a "front fly" ladder, whereas the ladder in question was a "rear fly" ladder.

From his tests, Dr. Johnson discovered that the ladder's locks could "hang up and cause a malfunction and cause the accident." Jt.App. at 191. Dr. Johnson went on to explain that this problem was the "false lock." He noted also that the occurrence of false lock is an improbable event. Basically, the purpose of Dr. Johnson's testimony was to show that extension ladders can sometimes false lock and how this phenomenon occurs. Dr. Johnson was never asked, nor did he ever give an opinion concerning any alleged design defect with the Keller ladder. Dr. Johnson stated that it was his opinion that the accident may have occurred as a result of plaintiffs' ladder going into a false lock.

Mr. Wallick was the former chief engineer of the Louisville Ladder Company, with twenty-five years of experience in designing ladders. Wallick was asked whether, in his opinion, the Keller ladder was defectively designed. He testified as follows:

Q. Mr. Wallick, do you have an opinion as to whether this ladder in front of you in this case, as to whether the design of this particular ladder is defective?

A. I can't say that the design is defective. Used properly, it would function properly. I only—if I can continue, my only question about this ladder is that when it is set up in its operation, the rung locks cannot be seen by the operator of the ladder[.]

Jt. App. at 308. Wallick was then asked to read from a report that he had prepared regarding the Keller ladder.

Q. Would you read for the jury what your opinions are in this case, please?

A. In total?

Q. Starting with letter A.

A.G. The design of the ladder is defective in that the rung locks are placed in such a position as to make it difficult, if not impossible for an operator standing on the ground looking up at the ladder to determine if in fact the rung locks are engaged.

Id. at 312 (portions A through F omitted).

Wallick also testified that at the time the Keller ladder was designed, all other rear fly ladders that he was aware of allowed the operator to ensure visually that the rung locks were engaged.[3] This was possible because these other ladders were equipped with "what's known as a tip on the end of the rung lock." Id. 316. According to Wallick, these tips are visible to the operator, standing on the ground, when the rung lock is properly engaged and, therefore, allow the operator to ensure that the locks are properly engaged without having to climb the ladder.

Wallick testified that the false lock phenomenon is common to all extension ladders.

Q. Back around 1991 when this ladder was purchased, in general in the ladder manufacturing industry were there any

3. Q. But Keller Ladder is the only ladder manufactur[er] that made this type of rung lock without the rear rung lock tip?

A. Without the tip. That's the only rung lock I've ever seen like that.

Jt. App. at 344.

ladders on the market that you are aware of that did not have any risk of being in a false lock position?

A. I don't think so.

Q. So that was a possibility or a potential tendency with any ladder on the market at that time?

A. Yes. *Id.* at 293.

## II.  STANDARD OF REVIEW

■ This court's standard of review of motions for judgment as a matter of law is identical to the standard used by the district court. *See Hurt v. Coyne Cylinder Co.* 956 F.2d 1319, 1328 (6th Cir.1992). In diversity cases, this circuit adheres to the minority rule that state law governs the standard for granting a motion for judgment as a matter of law. *See Gafford v. General Elec. Co.,* 997 F.2d 150, 170 (6th Cir.1993). The standard governing judgments as a matter of law, which is the same as directed verdicts in Kentucky, is as follows:

> The only question to be determined by the court on a motion for directed verdict is whether the plaintiff has sustained the burden of proof by "more than a scintilla of evidence," that is, has the plaintiff submitted "evidence of probative value having fitness to induce conviction in the minds of reasonable men?" In so ruling, "[t]he court must draw all fair and rational inferences from the evidence in favor of the party opposing the motion and a verdict should not be directed unless the evidence is insufficient to sustain the verdict. The evidence of such party's witnesses must be accepted as true." It is well settled that circumstantial evidence "will authorize a submission of the contested issue to the jury," and is capable of sustaining its verdict.

*Miller's Bottled Gas, Inc. v. Borg–Warner Corp.,* 955 F.2d 1043, 1050 (6th Cir.1992)

(quoting *Grant v. Wrona,* 662 S.W.2d 227, 229 (Ky.Ct.App.1983) (citations omitted)).

## III.  DISCUSSION

### A.  Standard of Liability; Proof of Design Defect

■ In products liability cases, Kentucky courts follow the Restatement (Second) of Torts § 402. *See Dealers Transport Co. v. Battery Distributing Co.,* 402 S.W.2d 441 (Ky.1966). Under this standard, liability will lie for "persons engaged in the business of manufacturing or selling products ... if the product is in a *defective condition unreasonably dangerous* to the user or consumer." *Montgomery Elevator Co. v. McCullough,* 676 S.W.2d 776, 780 (Ky.1984) (emphasis added). The key words in this analysis are "defective condition unreasonably dangerous." *Id.* The meaning of these words was resolved, and a definition of a defective product reached, by the Kentucky Supreme Court in *Nichols v. Union Underwear Co.,* 602 S.W.2d 429 (Ky.1980).

■ In *Nichols,* the Kentucky Supreme Court held that the test to determine if a product is defective is whether the product creates "such a risk [of an accident of the general nature of the one in question] that an ordinarily prudent company engaged in the manufacture of [such a product], being fully aware of the risk, would not have put it on the market[.]" *Id.* at 433. Thus, in a design defect case, the fact finder must decide whether the manufacturer that placed the product in commerce acted prudently, "i.e., was the design a defective condition which was unreasonably dangerous." *Id.* The Kentucky Supreme Court has also set forth a nonexhaustive list of factors to be taken into account in determining whether a product was manufactured "in a defective condition unreasonably dangerous[;]" these include:

(1) feasibility of making a safer product; (2) patency of the danger; (3) warnings and instructions; (4) subsequent maintenance and repair; (5) misuse; and (6) the product's inherently unsafe characteristics. *Montgomery Elevator Co.*, 676 S.W.2d at 780–81.

■ The district court held that plaintiffs' case failed because plaintiffs' expert witnesses did not specifically state that the ladder was unreasonably dangerous. The trial judge stated,

> [b]ut I think for the case to survive ... there needs to be some expert testimony even to get to the point of warning, ... but someone such as Mr. Wallick—all he said was that the fact that the tips weren't in this design made it defective, but he didn't say that it made it unreasonably dangerous for consumer.

Jt.App. at 353. As the trial court observed, Wallick testified that the ladder was defective, but he was not asked if it was unreasonably dangerous. However, we have found no case in which a Kentucky court has held that a plaintiff in a products liability case must produce expert opinion evidence that the product is unreasonably dangerous.

■ Generally, expert testimony is required in a products liability case only when the subject presented is so distinctly related to an area that is so far removed from the grasp of the average lay person. *See* 4A AMERICAN LAW OF PRODUCTS LIABILITY § 54:81, at 54–193 (Supp. 1999). Expert testimony may be required in cases in which the question is of a complex and technical nature such that a lay juror could not, without the aid of the expert, infer that a defective condition of the product caused the product's failure and caused the injury to the plaintiff. *See id.* In Kentucky design defect cases expert witnesses have explained the relevant elements of the design, pointed out perceived deficiencies or defects in the design, explained what choices the manufacturer made in the design, identified other alternative designs that were available, and pointed out the risks associated with the chosen design as compared with the alternatives available. *See Leslie v. Cincinnati Sub–Zero Prods., Inc.*, 961 S.W.2d 799, 804 (Ky.Ct.App. 1998). However, it is not the expert witness's role to determine if the product in question is or is not "unreasonably dangerous."

> Expert testimony is probably necessary to show the feasibility of an alternative design which would allegedly have prevented an accident; once a feasible alternative design is shown, however, *it is for the jury to decide whether the product is unreasonably dangerous.*

4A AMERICAN LAW OF PRODUCTS LIABILITY 3d, *supra*, § 54:81 at p. 54–194 (emphasis added).

This approach is illustrated in *Leslie,* where the court reviewed the deposition testimony of the plaintiff's expert who identified deficiencies in the product and testified that "fail safe" technology, which had been in existence for longer than sixty years, would have prevented the accident. There is no indication that the expert explicitly stated that, in his opinion, the product was "unreasonably dangerous." Nevertheless, the court found that his testimony was sufficient to overcome defendant's motion for summary judgment. *See id.* at 804; *see also Ford Motor Co. v. Fulkerson,* 812 S.W.2d 119, 123 (Ky.1991) (finding that there was "substantial evidence as to whether the design of the product was deficient" even though plaintiff's expert never said that the product was "unreasonably dangerous"). Indeed, in one case, the Supreme Court of Kentucky has held that a trial court did not abuse its discretion when it refused to permit an expert to give his opinion on the

issue of whether the product was unreasonably dangerous. *See Clark v. Hauck Mfg. Co.,* 910 S.W.2d 247, 253 (Ky.1995).

Thus, our task is to determine if plaintiffs submitted sufficient evidence that would justify a jury's determination that the ladder was unreasonably dangerous. As previously mentioned, the Kentucky Supreme Court has set forth a list of factors that a jury may consider in determining whether a product was manufactured "in a defective condition unreasonably dangerous." These factors include:

(1) feasibility of making a safer product; (2) patency of the danger; (3) warnings and instructions; (4) subsequent maintenance and repair; (5) misuse; and (6) the product's inherently unsafe characteristics.

*See Montgomery Elevator Co.,* 676 S.W.2d at 780–81. We conclude that the evidence presented by plaintiffs was such that, using these factors, a reasonable jury could find that the ladder was unreasonably dangerous.

Plaintiffs' expert, Mr. Wallick, who had over twenty-five years of experience as an engineer and designer of ladders, testified that the Keller ladder design *was defective* because it did not allow a person standing on the ground to visually determine if the rung locks were engaged.[4]

One of the factors to be considered in determining whether a product is unreasonably dangerous is the feasibility of making a safer product. *See Montgomery Elevator Co.,* 676 S.W.2d at 780–81. Wallick testified that at the time the Keller ladder was produced, other rear fly extension ladders on the market were safer.

Q. Do you take the position that all rear fly ladders are defective because of the fact that the rung locks are not visible to the user from the front?

A. No.

Q. And why—so there are other designs that are safer?

A. Yes. Ones that have rung locks with what's known as a tip on the end of the rung lock.

Jt. App. at 315, 317–18. A related factor is whether the product is a deviation from industry standards. *See Nichols,* 602 S.W.2d at 433. Wallick testified that at the time the Keller ladder was manufactured, it was the *only* rear fly ladder that did not have the "tips" at the end of the rung lock. *See* Jt.App. at 344. Therefore, a jury may have found that the Keller ladder deviated from industry standards.

An additional factor to consider is the product's inherently unsafe characteristics. *See Montgomery Elevator Co.,* 676 S.W.2d at 781. Plaintiffs submitted evidence from two expert witnesses concerning the inherent possibility that extension ladders may go into false lock. This possibility increases the importance of ensuring that the rung locks are properly engaged and the importance of making that function as convenient as possible.

Another factor is whether or not the product came with any warnings. *See id.*

---

4. In its brief, Keller points out that it objected to the fact that Mr. Wallick was allowed to be "rehabilitated after having testified unequivocally that the ladder was *not* 'defective,' and that, if '[u]sed properly,' it would function properly[.]" Keller Brief at 6 n. 2. There is no merit to this argument. Wallick did not originally testify "unequivocally" that the ladder was not defective. He testified that the design was not defective because the ladder would function properly if used correctly, and then attempted to clarify his response by discussing the fact that the rung locks could not be seen by the ladder's operator. He was then permitted to read from the report that he had prepared concerning the accident, in which he stated that the ladder's design was defective because of the positioning of the rung locks. He was *not* "impeached" by plaintiffs' counsel.

Here, the ladder did have a warning that instructed users to "make sure all locking devices are secure." Jt. App. at 109–10. However, the warning did not state *how* to ensure that all locking devices were secure. Mr. Stevens testified that he followed a procedure that he believed ensured that the locking devices were properly engaged but it did not involve direct physical inspection. The warning did not contain any information concerning the possibility of false lock. A jury may have found this warning inadequate for either of these reasons.

We conclude that plaintiffs presented sufficient evidence that would justify a jury's conclusion that the ladder's design was unreasonably dangerous. Accordingly, we find that it was error for the court to enter judgment as a matter of law in favor of Keller on the issue of design defect.

## B. Causation

The district court held that plaintiffs' case failed on the issue of causation. The trial judge stated,

> this case could be dismissed legitimately on two different grounds, the inadequacy of the expert proof as to the actual— the unreasonableness of the product, and *also on causation* and failure to follow the law.

Jt. App. at 355 (emphasis added). The court held that plaintiffs failed to show how the alleged design defect was the proximate cause of the accident. According to the court, "the actual reason, the ultimate reason for this accident was the fact that the warning was not obeyed, that the user did not make sure that the lock was secure." *Id.* at 352.

Plaintiffs argue that the district court focused too narrowly on Mr. Stevens's conduct. Plaintiffs argue that any negligence on the part of Mr. Stevens affects the apportionment of liability only.[5] Keller, on the other hand, argues that plaintiffs are required to present evidence of such a quality that it would support a finding that the defect was the probable, and not merely possible, cause of the accident.[6]

Under Kentucky law, the plaintiff in a products liability action has the burden of establishing causation under the substantial factor test. *See King v. Ford Motor Co.*, 209 F.3d 886, 893 (6th Cir. 2000). Under this test, the:

> plaintiff must prove that the defendant's conduct was a substantial factor in bringing about plaintiff's harm. Plaintiff may use circumstantial evidence, and in that situation, the evidence must be sufficient to tilt the balance from possibility to probability.

*Id.* (quotations omitted) (internal citations omitted).

Keller argues that Mr. Stevens was the sole proximate cause of the accident because he did not ensure the locks were engaged properly. However, the crux of plaintiffs' case is that the defective design of the ladder made it difficult or impossible

---

**5.** Plaintiffs note that under Kentucky law, apportionment of liability is proper in products liability cases. *See* Ky.Rev.Stat. Ann. § 411.182 (Michie 1996); *Caterpillar, Inc. v. Brock,* 915 S.W.2d 751, 753 (Ky.1996) ("in all tort actions, including products liability actions, fault is to be apportioned among all parties to each claim").

**6.** According to Keller, plaintiffs were required to show that the injury would have not oc-

curred or would have been lessened had the alternative design been used, citing *McCoy v. General Motors Corp.,* 47 F.Supp.2d 838 (E.D.Ky.1998). Since the alternative design rung locks with visible tips would have made it possible to determine visually that the ladder was securely locked before climbing it, the jury would be justified in finding that it was probable that the alternative design would have prevented the accident.

to determine visually if the locks were engaged. Mr. Stevens testified that he did follow the ladder's warning to ensure that the locks were properly engaged. He stated, however, that he could not do this visually because he could not see the rung locks. As noted above, although the ladder's warning label stated that the user needed to ensure the locks were engaged, it did not state *how* to ensure the locks were engaged and it did not mention the false lock phenomenon. We conclude that a reasonable jury could find that the inability to visually determine if the rung locks were properly engaged was a substantial factor in causing the accident. *See King*, 209 F.3d at 893. Therefore, it was error for the district court to find that plaintiffs failed, as a matter of law, to prove causation.

## C. Additional Reasons Relied Upon by the Trial Court

In ruling on Keller's motion for judgment as a matter of law, the trial court mentioned additional reasons for granting the motion. First, the court noted that there was no evidence that the risks of the design of the ladder outweighed its utility. *See* Jt. App. at 350. This appears to be a reference to the risk-benefit or risk-utility test which some states follow in design defect products liability cases. *See, e.g., Perkins v. Wilkinson Sword, Inc.*, 83 Ohio St.3d 507, 700 N.E.2d 1247 (Ohio 1998); *Prentis v. Yale Mfg. Co.*, 421 Mich. 670, 365 N.W.2d 176 (Mich.1984). We have found no Kentucky case which applies the risk-benefit test.

The risk-benefit test was proposed by the concurring justice in *Nichols v. Union Underwear Company. See Nichols*, 602 S.W.2d at 434 ("I believe that whether a design is unreasonably dangerous must be determined by a social utility standard risk versus benefit.") (Lukowsky, J., concurring). However, this suggestion was not adopted by the majority. As discussed,

*supra*, the majority felt that a jury should consider a multiplicity of factors in determining whether a product was unreasonably dangerous. *See id.* at 433. In *Ingersoll–Rand Co. v. Rice*, 775 S.W.2d 924, 932 (Ky.Ct.App.1989), the court said it was "disturbed by the risk/benefit analysis provided in [the jury instruction]" noting that such an instruction was not approved by the majority in *Nichols*. The court declined to proffer an opinion on its propriety in future cases finding that it was inappropriate in the case before it because "[t]here was simply no evidence before the jury ... which would allow the jury to evaluate the risks and benefits associated with the design[.]" *Id.* at 933.

In *Tobin v. Astra Pharmaceutical Products, Inc.*, 993 F.2d 528 (6th Cir.1993), a diversity case arising in Kentucky, defendant assigned as error the trial court's denial of its motion for judgment notwithstanding the verdict arguing, *inter alia*, that the risk-benefit theory proposed by the plaintiff could not establish liability under Kentucky law. The court noted that under Kentucky law, the test for whether a product is in a defective condition and unreasonably dangerous to the user "is whether an ordinarily prudent manufacturer, being fully aware of the risk, would have placed the product on the market." *Id.* at 536 (citing *Nichols*). Noting that the evidence of the risks and benefits of the product was "a main focus of the case" and that the jury was not given a risk-benefit analysis instruction, the court held that "plaintiff's arguments regarding the weighing of the risks against the benefits of [the product] were not improper, given the evidence presented in this case." *Id.* The court reconciled plaintiff's argument with Kentucky products liability law by summarizing plaintiff's arguments as follows:

In a nutshell, plaintiff claims that oral ritodrine is bereft of benefits as far as

improving neonatal outcome. Weighing no benefits against the serious risks posed by the drug and suffered by the plaintiff, it is clear, plaintiff asserts, that the risks outweigh the benefits and thus no "ordinarily prudent manufacturer" would put the drug on the market.

*Id.* at 537. We conclude that Kentucky has not adopted the risk-benefit analysis as the rule of liability in design defect cases, but that consideration of the relative risks and benefits of a particular design may be a proper factor to be considered together with the other factors mentioned in *Nichols* in determining whether an ordinarily prudent manufacturer would put the product on the market. It follows that the failure to offer evidence specifically addressing the risk-benefit analysis would not be fatal to a plaintiff's case as long as there was other evidence which would support the plaintiff's claim that the product was unreasonably dangerous.

In its ruling, the trial court also referred to the fact that the false lock phenomenon is extremely rare and that the phenomenon was common to all extension ladders regardless of design. The court concluded that, as a result, the Keller ladder was in conformance with industry standards and that "this particular characteristic is not something that can be corrected." Jt. App. at 351. While this may be true, it is not a sound reason for the court's ruling. Plaintiffs did not claim that the ladder was defective because it had the capability of being configured in the false lock configuration. Instead, plaintiffs claimed that the ladder was defective because its particular design made it difficult or impossible to detect whether the ladder was in a false lock configuration.

In ruling on Keller's motion for judgment as a matter of law, the court concluded that the risk of false lock was a danger which could be sufficiently ameliorated by the use of a warning, noting however:

[o]bviously, there are other ways apparently from the evidence that the danger could be ameliorated, and that is by the use of the tips, but I don't think there's any—there wasn't any testimony and I don't think anyone would ever suggest that simply because you have the tips on, that that eliminates the need for the warning. *Id.* It seems likely that what the court meant was, that in its opinion, having the tips on the locks would not eliminate the need for *following* the warning. We conclude that this was an issue for the jury under Kentucky products liability law.

In summary, we find that plaintiffs did present sufficient evidence to allow a reasonable jury to conclude that the Keller ladder had a design defect which rendered the ladder unreasonably dangerous, and that a jury could reasonably determine that such defect was the proximate cause of the accident. Accordingly, the district court's decision is REVERSED. This case is REMANDED to the district court for further proceedings consistent with this opinion.